Carboloy Company, Inc. v. Commissioner.
Carboloy Co. v. Commissioner
Docket Nos. 101345, 101920.
United States Tax Court
1943 Tax Ct. Memo LEXIS 212; 2 T.C.M. (CCH) 413; T.C.M. (RIA) 43325; July 2, 1943
*212 Petitioner, after certain negotiations, entered into a contract dated May 1, 1936, with a partnership whereby, under Article 1 petitioner was to acquire from the partnership for a certain consideration stated in Article 1 the latter's "hard metal composition" business, including the inventory, good will, customers' list and contracts pertaining thereto, and under Article 3 petitioner was to make certain payments semi-annually for seven years to the partnership providing "that on each semi-annual date * * * during the period * * * from May 1, 1936, to and including April 30, 1943, neither said Thomas Prosser & Son, nor said Richard Prosser, nor said Roger D. Prosser shall for any part of any six months preceding said November 1 or May 1, as the case may be, have been in competition * * * with the second party in respect of 'hard metal composition'." Held, the payments made by petitioner during the taxable years in question under Article 3 were made in consideration for the partnership refraining from competing with petitioner during the period for which the payments were made and are, therefore, deductible by petitioner under section 23 (1), Revenue Act of 1936 as amounts representing *213 the exhaustion of a contract used in petitioner's trade or business, ratably by the lapse of time; and if not deductible under section 23 (1), such payments are deductible as ordinary and necessary business expenses under section 23 (a) of the same Revenue Act. Eitingon-Schild Co., Inc., and Subsidiaries, 21 B.T.A. 1163, followed. John M. Hudson, Esq., 3000 Union Guardian Bldg., Detroit, Mich., and Selden S. Dickinson, Esq., 3000 Union Guardian Bldg., Detroit, Mich., for the petitioner. Paul A. Sebastian, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion These proceedings, hereby ordered consolidated for the purposes of this report, involve the determination by the respondent against petitioner of deficiencies in income tax for the calendar years 1936 and 1937 in the amounts of $3,437.67 and $8,046.45, respectively. The respondent made two adjustments to petitioner's net income as disclosed by its return for 1936, one of which was "(a) Amortization disallowed $16,666.66" which he explained in a statement attached to the deficiency notice, as follows: (a) You claimed a deduction of $16,666.66 as amortization expense paid or *214 incurred in the taxable year in the conduct of your trade or business, and arising from a certain contract entered into May 1, 1936 with Thomas Prosser & Son. Careful consideration has been given to the facts of record together with the information submitted at the various conferences. However, the amortization claimed under the Thomas Prosser & Son contract has been disallowed, since the consideration therefor was paid in the acquisition of a business protected by patents which are under the control of yourself or your parent corporation. The respondent made six adjustments to petitioner's net income as disclosed by its return for 1937, one of which was "(a) Prosser payments $25,000.00" which he explained in a statement attached to the deficiency notice, as follows: (a) During the year 1936 you acquired the business of Thomas Prosser and Son; as part of the purchase agreement you agreed to pay not less than $175,000.00 and not more than $300,000.00 over a period of 7 years. During the year 1937 you made a payment of $25,000.00 on the above-mentioned contract. The payment of $25,000.00 was claimed as a deduction in your return for the year 1937. It is held that the payment of *215 $25,000.00 on your contract with Thomas Prosser and Son represents a capital expenditure and, as such, it is not deductible in computing net income. Petitioner, by appropriate assignments of error, contests the $16,666.66 adjustment for 1936 and the $25,000 adjustment for 1937, and alleges that under section 23 (a) of the Revenue Act of 1936 these amounts are deductible as ordinary and necessary expenses paid or incurred during the respective taxable years in carrying on a trade or business, or, in the alternative, that under section 23 (1) of the same Act these amounts are deductible from gross income as a reasonable allowance for the exhaustion or depreciation of an asset or property of petitioner used in its trade or business. The six remaining adjustments for the two years in question are not contested. Findings of Fact Petitioner is a New York corporation, organized September 22, 1928, with its principal place of business in Detroit, Michigan. Its returns for the taxable years 1936 and 1937 were filed with the collector of internal revenue for the district of Michigan. Petitioner is a wholly owned subsidiary of the General Electric Company of New York, and is engaged in the *216 business of manufacturing and selling hard metal products, including "hard metal composition" products, which consists of combining tungsten and carbon and cementing the same with cobalt to produce hard metal. The hard metal composition manufactured by petitioner is employed in producing, among other things, machine cutting tools, wire drawing dies, and wear-resistant materials or parts. Fried. Krug Aktiengesellschaft, hereinafter sometimes referred to as the Krupp Company, a German corporation located in Essen, was the owner of certain United States patents, as well as foreign patents, relating to the manufacture and sales of hard metal composition products. General Electric Company and the Krupp Company entered into an agreement dated November 5, 1928, hereinafter sometimes referred to as the Krupp agreement, whereby the Krupp Company assigned to General Electric Company certain rights under its United States patents. On December 6, 1928, General Electric Company and petitioner entered into an agreement whereby General Electric Company assigned to petitioner the patent rights acquired from the Krupp Company. The Krupp agreement, so far as here material, provided for the assignment *217 by the Krupp Company to the General Electric Company of its entire right, title and interest in, to and under certain United States patents and applications for United States patents, and its entire right, title and interest for the territory of the United States in, to and under any United States patents, patent rights and inventions then owned or controlled by the Krupp Company, or which should be owned or controlled by it at any time during the life of the agreement, relating to hard metal composition, or to improvements as therein defined. The agreement, however, was made subject to a prior agreement entered into between the Krupp Company and Gewerkschaft Wallram, another German corporation, under which Krupp had agreed to supply the Wallram Company with material made in the Krupp factories in Germany for the manufacture of wire drawing dies which, under the agreement, might be exported to all countries. Under the agreement, the Krupp Company also reserved the right to export to the United States tools and dies and parts thereof manufactured by the Krupp Company in Germany and to sell the same to importers of such material. By the Krupp agreement, the General Electric Company *218 and, through it, the petitioner did not acquire exclusive rights with respect to the dealing in hard metal composition in the United States but acquired only limited rights. The Krupp agreement was to run for a term of 15 years from the date thereof, and thereafter until terminated by six months notice by either party. By the agreement of December 6, 1928, between the General Electric Company and petitioner, the General Electric Company granted petitioner the exclusive license, with certain specified exceptions, under the patent rights acquired from the Krupp Company, as well as under certain patents and patent rights owned by the General Electric Company relating to hard metal composition, for the life of the agreement to make use and sell throughout the United States, but not for export to any foreign country. This agreement, by its terms, expired with the termination of the Krupp agreement of November 5, 1928. Thomas Prosser & Son, sometimes hereinafter referred to as Prosser, is a copartnership located in the State of New York, and for many years has been engaged as sales agents generally in the steel business. Prior to May 1936 Prosser also engaged as sales agents in the hard *219 metal composition business. Since 1929, and prior to May 1936, Prosser was the sales agent in the United States for the Krupp Company handling hard metal composition products and other products of the Krupp Company. The hard metal composition business of Prosser was only one phase or aspect of their entire business. The sales by Prosser during 1935 of hard metal composition products aggregated approximately $265,715 and during the first three months of 1936 the sales by Prosser of hard metal composition products aggregated approximately $71,519. The sales of hard metal composition products by Prosser to its larger customers in 1935 were $232,122.67, and in the first three months of 1936 were $57,131.28. During the years 1935 and 1936, the sales of hard metal composition products by petitioner to these same customers to whom the Prosser sales were made aggregated $803,364.35 and $515,946.42, respectively. Petitioner in 1936, and prior thereto, was in open competition with Prosser in the hard metal composition business, and was serving substantially the same customers. Petitioner was serving approximately all of the customers that Prosser had, and was selling considerably more to those *220 accounts than Prosser. The sales by petitioner to the same customers dealing with Prosser were generally about four or five times greater per account. The profits and losses of Prosser from its hard metal composition business during the years 1929 to 1935 were as follows: Year
Loss
Profit
1929 (approx.)
$29,748.88
1930
$23,098.64
1931
23,256.65
1932
32,435.33
1933
4,871.37
1934
4,580.86
1935
23,583.06
$83,661.99
$57,912.80
The period of years from 1929 to 1935, inclusive, constituted a period of development in the hard metal composition business for the reason that during this period there was being introduced a brand new product in the United States. In late 1935 and early 1936, the General Electric Company entered into negotiations with the Krupp Company for an amendment of the Krupp agreement dated November 5, 1928, for the purpose of obtaining exclusive rights under the Krupp Company patents in the United States and Canada and, generally, for the purpose of clearing up a number of things which had been impeding the progress of the development of the hard metal composition business in this country. Among the obstacles to the consummation of an amendment *221 to the agreement was outstanding sales agency agreement between the Krupp Company and Prosser. It was not possible to consummate the amending agreement until the Prosser agency had been cleared up to the satisfaction of Prosser. The General Electric Company stipulated as a condition to entering into the amending agreement that an arrangement satisfactory to Prosser would be made. As a result of the negotiations referred to in the preceding paragraph, the sales agency contract between the Krupp Company and Prosser relating to hard metal composition was terminated by letter dated April 23, 1936, effective on or before June 1, 1936. Also, as a result of such negotiations, the Krupp Company and General Electric Company, on April 23, 1936, entered into an agreement amending the Krupp agreement of November 5, 1928. By the amendatory agreement, so far as here material, the Krupp Company assigned to the General Electric Company all its right, title and interest under the patents and applications for patents relating to hard metal composition referred to in the original agreement and in the amendatory agreement both for the manufacture and sale of such material and products in the United *222 States and Canada. Further, as a result of such negotiations, Prosser as first party and petitioner as second party entered into an agreement dated May 1, 1936; and the General Electric Company and petitioner entered into an agreement to take effect June 1, 1936. Article 1 of the May 1, 1936 agreement between Prosser and petitioner provided that on or before May 15, 1936 Prosser would deliver to petitioner "all inventory (which is approximately as shown on the annexed Schedule A) [1] of sintered carbide hard metal composition blanks, tools, and/or parts thereof (all of which are hereinafter included in the term 'hard metal composition'), now owned by the first party" and further provided that Prosser "does hereby assign, transfer and set over to the second party, so far as it may be able so to do, all business of the first party in 'hard metal composition' and the good will thereto appertaining, but not including any cash, receivables, or other proceeds (except as hereinafter in this Article 1 provided) of any business accepted by the first party up to and including May 15, 1936, and not including any other business or good will of the first party." Under this article it was also *223 provided that Prosser would request its sales force engaged in the sale of hard metal composition to enter the employ of petitioner if and to the extent requested by petitioner, except that W. E. Guild and W. D. Briggs would not be requested to enter the employ of petitioner for a longer period than 90 days from the date of the agreement. Article 1 of the agreement further provided that: * * * Prior to May 15, 1936, the first party in cooperation with the second party will notify its customers for "hard metal composition" that it has given up its business in "hard metal composition" and has turned the same over to the second party and will request its said customers to continue to deal with the second party. Promptly after the execution of this agreement, the first party will endeavor to terminate as soon as possible its obligations under agency contracts with the concerns listed on Schedule "B" hereto attached. [2] Within thirty (30) days from the date of execution of this agreement, the second party will pay to the first party the sum of Thirteen thousand five hundred dollars ($13,500), which payment is not included in the payments which are to be made under Article 3 hereof. *224 The material provisions of Article 3 of the May 1, 1936 agreement between Prosser and petitioner are as follows: ARTICLE 3. Provided that on each seminannual date (November 1 or May 1, as the case may be) during the period (herein termed the "contract period") from May 1, 1936, to and including April 30, 1943, neither said Thomas Prosser & Son, nor said Richard Prosser, nor said Roger D. Prosser shall for any part of any six months preceding said November 1, or May 1, as the case may be, have been in competition (as the term "competition" is hereinafter defined) with the second party in respect of "hard metal composition," the payments hereinafter specified shall be made by the second party. * * * * *
The total to be paid to the first party under this Article 3 by the second party for the "contract period" shall be such amount as shall be produced by multiplying the "fixed percentage" by the "net sales" for all six-months periods included in the "contract period"; but such total amount to be paid shall not be less than One hundred seventy-five thousand dollars ($175,000) nor more than Three hundred thousand dollars ($300,000). Subject to the foregoing provisions of the Article *225 3, the second party will pay to the first party semi-annually for the seven (7) years of the "contract period," the "fixed percentage" multiplied by the "net sales." Dates of payment shall be thirty (30) days after the end of each six (6) months period. If, at the end of any such semi-annual period, the total amount so payable under this article 3 from the inception of the "contract period" to and including the payment date next following the end of said semi-annual period shall be less than the cumulative amount set forth in the following schedule opposite said next-following payment date, the deficiency will be paid by the second party to the first party at the time when payment for the period in question is provided to be made. SCHEDULE
Cumulative
No. of
Date payment
amount
payment
is to be made
to date
1st
November 30, 1936
$12,500
2nd
May 30, 1937
25,000
3rd
November 30, 1937
37,500
4th
May 30, 1938
50,000
5th
November 30, 1938
62,500
6th
May 30, 1939
75,000
7th
November 30, 1939
87,500
8th
May 30, 1940
100,000
9th
November 30, 1940
112,500
10th
May 30, 1941
125,000
11th
November 30, 1941
137,500
12th
May 30, 1942
150,000
13th
November 30, 1942
162,500
14th
May 30, 1943
175,000
*226 In accordance with the May 1, 1936 agreement between Prosser and petitioner four of the ten salesmen of Prosser entered the employ of petitioner. W. E. Guild, an employee of Prosser and one of those not entering the employ of petitioner, entered into an agreement with petitioner not to enter into competition with petitioner in the hard metal field either in the United States or Canada for two years for and in consideration of $1.00 and the further consideration of the execution of the agreement of May 1, 1936 between petitioner and Prosser. The inventory of hard metal composition acquired from Prosser by petitioner in pursuance of the agreement of May 1, 1936 was set up on petitioner's books of account and records at a cost of $13,500 and has been, or will be reflected in its cost of goods sold at that cost. The agreement between General Electric Company and petitioner which took effect on June 1, 1936 cancelled the prior agreement of December 6, 1928 between the same parties. Under the new agreement General Electric Company granted petitioner an exclusive license, with exceptions not here material, under all the patent rights acquired from the Krupp Company owned by General Electric *227 Company, for the life of the agreement, to make, use and sell hard metal composition throughout the United States, but not for export to any foreign country. Petitioner acquired from Prosser no other business than its "hard metal composition" business, which was only one phase of the business carried on and conducted by Prosser. The sole and entire consideration under the agreement of May 1, 1936 paid by petitioner to Prosser for its "hard metal composition" business, the good will pertaining thereto, the inventory of "hard metal composition", the customer list and contracts was the $13,500 as specified in Article 1 of the agreement. The payments to be made by petitioner to Prosser as provided in Article 3 of the agreement of May 1, 1936 were solely and exclusively in consideration of Thomas Prosser & Son and the individual partners thereof refraining from competition with petitioner in the "hard metal composition" business for each of the six months periods during the life of the contract. Pursuant to Article 3 of the agreement of May 1, 1936, petitioner paid to Prosser during the year 1936 for the period ending December 31, 1936, the aggregate amount of $16,666.66, which amount *228 accrued during such period. Further pursuant to Article 3 of such agreement, petitioner paid to Prosser during the year 1937 for the period January 1 through December 31, 1937, the aggregate amount of $25,000, which amount accrued during such period. Petitioner kept its books and filed its income tax returns for the years 1936 and 1937 on the accrual basis. Any part of the stipulation of facts and the supplemental stipulation of facts, including the exhibits thereto, not specifically set forth herein are incorporated herein by reference and made a part of these findings of fact. Opinion BLACK, Judge: The question involved in these proceedings leans more to the fact side than to the law, in that the parties are not in agreement as to the purposes for which the expenditures in question were made. Petitioner contends that it paid out the $16,666.66 in 1936 and the $25,000 in 1937 in consideration of Thomas Prosser & Son and the individual partners thereof refraining from competition with petitioner in the "hard metal composition" business, whereas the respondent insists that the expenditures were in part payment for the acquisition by petitioner of the "hard metal composition" business *229 theretofore conducted by Prosser together with the good will applicable to that portion of Prosser's business, the inventory set out in Schedule "A" and the contract holders listed in Schedule "B" of the May 1, 1936 agreement between Prosser and petitioner. We have resolved this part of the controversy in petitioner's favor. A careful reading of the May 1, 1936 agreement convinces us that Articles 1 and 3 thereof are independent articles. Under Article 1 petitioner was to acquire certain property rights for which it was to pay and did pay $13,500. Article 1 specifically provided that this payment of $13,500 "is not included in the payments which are to be made under Article 3 hereof." The respondent argues that this $13,500 should be regarded as only part payment for the property rights mentioned in Article 1, and that the payments provided for in Article 3 should be regarded as additional payments for the property rights acquired under Article 1. We cannot so construe the contract. Article 3 specifically provides: ARTICLE 3. Provided that on each semiannual date * * * during the period * * * from May 1, 1936, to and including April 30, 1943, neither said Thomas Prosser & Son, *230 nor said Richard Prosser, nor said Roger D. Prosser shall for any part of any six months preceding said November 1, or May 1, as the case may be, have been in competition * * * with the second party in respect of "hard metal composition," the payments hereinafter specified shall be made by the second party. As we read the contract the payments specified in Article 3 (and the payments in question in these proceedings were the payments specified in Article 3) were to be made only on one condition, namely, that the Prossers refrain from competition. If the Prossers did not refrain from competition, the payments specified in Article 3 would not have to be made, but this would not deprive the petitioner of the property rights acquired under Article 1 of the contract. It paid $13,500 for those property rights and as we read the contract it was not required to pay any more therefor. The payments specified in Article 3 were for refraining from competition and we have so found as an ultimate fact in our findings. Petitioner contends that Eitingon-Schild Co., Inc., and Subsidiaries, 21 B.T.A. 1163, (fifth issue, p. 1180) is on all fours with the instant *231 proceedings. We agree. In that case the petitioner's subsidiary, the United Fur Exchange, Inc. entered into a contract with one Ahern, the first, second and third paragraphs of which provided for the sale by Ahern to the subsidiary of the stock of certain corporations owned or controlled by him, with numerous representations and warranties as to the properties and assets of such corporation. The third paragraph of the contract concluded as follows: All the foregoing provisions in Paragraphs First to Third, both inclusive, are entirely distinct from Paragraph Fourth following: Under paragraph fourth of the contract, Ahern agreed that he would neither directly nor indirectly, within a period of ten years from the date of the contract, engage in business in competition with the subsidiary. Paragraph fifth of the contract provided for the payment by the subsidiary to Ahern of $403,484.42 in consideration of the sale and delivery by Ahern of the corporate stocks and his agreements, representations and guarantees, other than those set forth in paragraph fourth. Paragraph sixth of the contract then provided that in consideration of Ahern's agreements in paragraph fourth, the subsidiary *232 would pay to a third party for him the sum of $375,000, of which $18,750 should be payable semi-annually on specified dates over the period of the contract. Pursuant to the provisions of paragraph sixth of the contract, the subsidiary paid to Ahern the sum of $37,500 and claimed a deduction therefor as business expense, which deduction was disallowed by the Commissioner. In holding that the sum so paid was an allowable deduction, we said: In the instant case, the petitioner's subsidiary acquired valuable rights under its contract with Ahern at a total cost of $375,000 payable at the rate of $37,500 annually for the period of ten years. The contract has a life of ten years, upon the expiration of which its value will be exhausted. Hence its value was and is being exhausted ratably by the passage of time. * * * But if the payment of the amount be held to be an ordinary and necessary expense instead of a capital expenditure to be amortized, the same result would be reached, the same amount would be allowable as a deduction in each year. In our opinion, the respondent erred in disallowing the deduction claimed, and his action on the fifth issue is, therefore reversed. We hold that the *233 instant proceedings are governed by Eitingon-Schild Co., Inc., and Subsidiaries, supra. Therefore, the payments in question, in accordance with the rule in that case, are deductible by petitioner as representing the exhaustion of a contract used in petitioner's trade or business, ratably by the lapse of time; and if not deductible under section 23 (1), such payments are deductible as ordinary and necessary business expenses under section 23 (a) of the same revenue act. Decisions will be entered under Rule 50. Footnotes
1. SCHEDULE "A" Approximate inventory of sintered carbide hard metal composition blanks, tools and/or parts thereof owned by THOMAS PROSSER & SON. 13,996 grams (actual weight) of loose tips; 8,643 grams (actual weight) of selvage tips; 525 finished tools; 450 demonstration tools. ↩
2. Schedule "B" listed 53 contract holders whose contracts expired on dates between June 1, 1935 and March 1, 1937 and 7 contract holders whose contracts continued until cancelled by either party on 60 days' notice in writing.↩