**NEW YORK AND HONDURAS ROSARIO MINING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.**

Docket No. 8940. Promulgated June 23, 1947.

*Francis D. Murray, Esq.*, for the petitioner.
*Walt Mandry, Esq.*, for the respondent.

OPINION.

JOHNSON, *Judge*: The facts were stipulated, together with certain exhibits attached thereto, and we adopt said stipulation and exhibits as our findings of fact.

From these we find petitioner is a domestic corporation, organized under the laws of the State of New York, with its principal office at 120 Broadway, New York City. It filed its Federal income tax returns for the calendar years 1941 and 1942 with the collector of internal revenue for the second district of New York on the accrual basis.

Since 1880 petitioner has been engaged in mining operations in Honduras, where it owns surface lands and mines yielding gold and silver, and in 1941 and 1942, as in prior years, it shipped the ores extracted to the United States for smelting, refining, and sale. All mines and mining operations in Honduras are subject to a comprehensive mining code promulgated on February 15, 1937, as Decree No. 64. By this code mines are recognized as a form of real property distinct and separate from the surface of the land (article 11), and the State, declared to be the owner, may grant private parties the right to explore, work, and operate mines and to dispose of the ore under regulations and conditions prescribed by the code (article 1). The holder of such a right, who may be any person competent to own real estate, with exceptions not here material (article 22), is the exclusive owner within the limits of his mining claim (article 67), and may convey the right to others by a publicly recorded instrument or may transmit it upon death as in the case of other real property (article 99). But ownership is granted on condition of constant operation, observance of safety, order, sanitation, and other requirements of the code, and in case the grantee fails to comply, ownership of the mine reverts to the State (article 14). An annual tax of one lempira (50 cents U. S. currency) a hectare of the limit area is imposed (article 149), and as originally enacted the code further provided:

Article 221. The mining enterprises shall give to the State five per cent of the liquid profits of the exploitation of their mines, and the government shall have the right to examine the books of said enterprises whenever it deems it convenient.

On December 11, 1939, this article was amended to read:

Article 221. The mining enterprises shall pay to the State at least five per cent of the liquid profits of the exploitation, said percentage to be fixed by contract with the executive power with special approval of the National Congress. The executive power may examine the books of account of said enterprises, whenever it finds it expedient. The Ministry of Finance in its yearly report shall inform the Congress as to the examinations made and the amounts received by the State in compliance with this article.

For the calculation of the liquid earnings, the salaries and personal expenses assigned to the boards of directors of the enterprises shall be excluded.

The concessions granted before the enforcement of this law shall be clearly considered as limited to the respective municipal jurisdictions in accordance with the provisions of said concessions.

Pursuant to article 221, petitioner and the Republic of Honduras on January 18, 1940, made a contract for petitioner's exploitation of particularly described mines for a twenty-year period ending December 31, 1960. This contract was approved by and incorporated in Decree No. 67, a legislative enactment of the National Congress of Honduras on February 13, 1940. Prior thereto petitioner and the Honduran Government had entered into agreements for twenty-year periods, setting forth petitioner's rights and obligations in operating mines in 1880, 1900, and 1920. By the terms of the contract incorporated in Decree No. 67:

The Government guarantees to the Contractor during the life of this contract that it or its successors or assigns will be obligated to satisfy only the imposts, taxes, duties, services, contributions or charges of any kind, which at the present time exist in the Republic, whether they be of general, local, national, regional or departmental character, in the amount and proportion in which they are now established, without being affected by such charges as in the future might make the mining exploitation more costly. * * *

In the second paragraph petitioner obligates itself within five days to deliver to the General Treasury of the Republic of Honduras the sum of $250,000. Quoting therefrom:

* * * Said sum, advanced without interest, shall be on account of the income tax of seven per cent upon the liquid profits of the exploitation of the mines which it is now operating at Nuevo Rosario, jurisdiction of this central District, Department of Tegucigalpa, at the hamlet of San Juancito, which tax will begin to be collected from the first of January of the year one thousand nine hundred and forty one, and thereafter, in conformity with the income tax which the Contractor is obligated to pay upon the liquid profits from the aforesaid date, in conformity with this contract and the laws of the country; it being understood that the seven per cent shall be applied only upon the profits of Nuevo Rosario which the Contractor is exploiting at the present time, but that on the liquid profits of the other mining properties which it may exploit in the Republic, it shall pay to the Government five per cent only during the first ten years of exploitation, and that for the subsequent years the Contractor will pay such maximum percentage above five per cent as by mutual agreement the parties hereto shall determine in the contracts they may execute for the purpose of this exploitation.

The liquid profits to be derived by the Contractor from its mining operations in the Republic of Honduras shall be calculated in the customary manner, that is to say, the amount received from its exports, less its operating expenses within the country and abroad directly applicable to the management of its mines in Honduras, plus reasonable deductions for amortization and depletion of its property and inventories, with the exception of the disbursements by reason of salaries and personal expenses assigned to the Board of Directors of the enterprise.

*     *     *     *     *     *     *

In case of disagreement between the Government and the Contractor over the sum of the liquid profits upon which the tax of seven per cent is levied on the mining operations of San Juancito, and five per cent upon the new mines which it may acquire and exploit, there shall be taken as such sum that which has been accepted by the Government of the United States of America in imposing its tax upon the liquid profits of the mining operations of the Contractor in Honduras.

Paragraph 14 of Decree No. 67 stipulates that if petitioner suspends its mining operations, temporarily or permanently, it will not have the right to claim from the Government the return of all or any part of the $250,000.

In compliance with paragraph 2 of Decree 67, petitioner, on January 17, 1940, delivered to the General Treasury of the Republic of Honduras the sum of $250,000.

The Government of Honduras, for the calendar year 1941, applied $21,120.27 of the $250,000 in payment of 7 per cent of the liquid earnings of petitioner in the exploitation of mines during that year, as shown by statement filed by petitioner with the Honduran Government.

The Government of Honduras, for the calendar year 1942, applied $32,724.47 of the $250,000 in payment of 7 per cent of the liquid earnings of petitioner in the exploitation of mines during that year, as shown by statement filed by petitioner with the Honduran Government.

In its income tax return for 1941 petitioner deducted as credit against its United States income taxes a foreign tax credit in the amount of $21,120.27, and for 1942, $32,674.84, and did not deduct said amounts in computing its net income for those years.

The question here presented is whether certain payments made by the petitioner to the Republic of Honduras in 1941 and 1942 are income taxes within the meaning of section 131, Internal Revenue Code, entitling it to a credit for such amounts against income taxes due by petitioner to the United States in those years.

Section 131 of the code gives the citizens and domestic corporations of this country the right to claim and receive as a credit on their income taxes the amount of any income tax "paid or accrued during the taxable year to any foreign country or to any possession of the United States."

Concededly, Honduras is a foreign country. Petitioner paid the Republic of Honduras "seven per cent of its liquid profits" on its mining operations in that country during the taxable years. Were the amounts so paid income taxes within the purview of section 131, as contended by the petitioner?

In support of its contention petitioner stresses: First, that the payments in question were specifically designated as income taxes in the contract between it and the Honduran Government, which contract was approved and incorporated in Decree No. 67 passed by the National Honduran Congress; second, that the prescribed method of computing the net profits is substantially the same as the method fixed by the Internal Revenue Code for computing the United States income tax. Of significance is the provision in the contract that in case of disagreement between the Honduran Government and petitioner as to the amount of liquid profits:

\* \* \* there shall be taken as such sum that which has been accepted by the Government of the United States of America in imposing its tax upon the liquid profits of the mining operations of the Contractor in Honduras.

The Supreme Court, in *Burnet* v. *Chicago Portrait Co.*, 285 U. S. 1, declared that one of the primary purposes of section 131 of the Internal Revenue Code, granting credits for income taxes paid to foreign countries, was to mitigate the evil of double taxation. Petitioner contends that this purpose would be defeated if it should be required to pay taxes both to Honduras and the United States on the same net profits or income, arrived at in substantially the same manner in both countries.

Respondent answers this argument by invoking the doctrine announced by the Supreme Court in *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, to the effect that, if a tax is imposed for the privilege of doing business, then it is not an income tax, although measured on the basis of income. Later cases have followed this holding and it now seems to be well settled.

Conversely, a tax imposed on income determined by a method different from that prescribed by the Internal Revenue Code may nonetheless be an income tax within the meaning of section 131. In *Santa Eulalia Mining Co.*, 2 T. C. 241, this Court so classed a tax imposed by a foreign government on gross income.

Answer to the fundamental question, determinative of whether the petitioner or respondent is right, depends therefore, not on the method of computation, but rather on the nature and purpose of the payment involved. And this answer is not necessarily supplied, as petitioner urges in its first argument, by designation of the payment as an income tax in the Honduran statute which ratifies the contract, fixes the rate, and prescribes the manner of payment. Such designation, however, is

not without some persuasive force, as the Supreme Court recognized in *Flint* v. *Stone Tracy Co.*, *supra*, saying:

While the mere declaration contained in a statute that it shall be regarded as a tax of a particular character does not make it such if it is apparent that it cannot be so designated consistently with the meaning and effect of the act, nevertheless the declaration of the lawmaking power is entitled to much weight. * * *

After giving due weight to the declaration contained in the contract and approved by special act of the Honduran Congress that the payment here involved was an income tax, we are called upon to decide whether such declaration is consistent with the nature, meaning, and effect of such tax; that is, whether the Honduran Government intended to impose and did impose a direct tax upon the net profits or income of those engaged in mining enterprises, or whether its purpose was to collect rents, royalties, or other payments for the privilege of exploiting mines in that country.

Honduras had no general income tax law, the payments in question being made pursuant to a provision in its mining code requiring mining enterprises to pay to the State "at least 5 per cent of the liquid profits of the exploitation," the percentage to be fixed by contract with the government and approved by the National Congress.

Petitioner's contract with the Honduran Government required it to pay "seven per cent of the liquid profits on mines it is now operating" and 5 per cent on the liquid profits of other mining properties during the first ten years of exploitation, and for the subsequent years such maximum percentage above 5 per cent as mutually agreed by the parties in contracts they may execute for the purpose of the exploitation.

These payments in the contract were declared to be "on account of the income tax."

There is no evidence that the words "income tax" appear in any law of Honduras other than this contract which was incorporated in and approved by Decree No. 67. This act of the Honduran Congress, approving the contract, affects only the petitioner and can not be considered as general legislation.

Petitioner, as required by the contract, delivered to the general treasury of Honduras $250,000 "advanced without interest" in payment of the amounts which were to "begin to be collected from the first day of January 1941" and thereafter as they accrued.

Under the Honduran Mining Code the State was declared to be the owner of the mines and no one, not even the owner of the surface of the land, could operate or exploit the mines except by grant from the State and also a compliance with the numerous regulations contained in the code; and, even after the right to exploit was granted, it was subject to forfeiture for failure to continue observance of such regu-

lations and requirements. Among other requirements was the payment of the amounts here involved, such amounts being determined and agreed upon pursuant to the provisions of the mining code.

One could not exploit a mine without permission of the State, and to obtain such permission it was necessary to pay or contract to pay the State at least 5 per cent of the liquid profits of the mines, the exact percentage payable being determined in each instance by a contract between the taxpayer and the government.

The amounts here involved are inextricably interwoven with the grant or franchise to operate and exploit mines, and it appears from the record as a whole that the Honduran Government exacted these amounts for that right and privilege. The right of the petitioner herein to exploit mines in Honduras is contained in its contract with the government and the payments herein questioned appear to have been the consideration which prompted the government to make such grant. It would seem, therefore, that the amounts paid by the petitioner were for the right or privilege of mining the particular property, and no Honduran court decision to the contrary has been brought to our notice.

Furthermore, the lack of uniformity as to the rate of payments which might be agreed upon with respect to various mining properties indicates a payment for the right and privilege of mining the particular property involved other than an income tax. While we have held that an income tax could be within the purview of section 131 when levied by a foreign country against a particular class of persons engaged in a certain line of business, under the Honduran Mining Code there may be different percentages paid for operating similar businesses, the rate in each instance being subject to negotiation and contract between the government and the individual taxpayer. Even in petitioner's contract with the government two different rates were prescribed, 7 per cent on the liquid profits of the mine then operated and 5 per cent on those thereafter to be operated.

While there was no evidence upon the subject, inferentially it would seem that the Honduran Government regarded the privilege of operating the old mines worth more than the new and undeveloped mines, and hence the rate in the one was placed at 7 per cent and the other at 5 per cent.

Furthermore, as to the advance payment of $250,000, the contract provided that if petitioner ceased operation of the mines for any reason, either temporarily or permanently, it was not entitled to the return of any part of such advance payment. Such a forfeiture is consistent with the granting of a right to exploit the mines, but hardly consistent with our theory of an income tax.

All cases cited by the petitioner are distinguishable. In no case cited was the rate determined and fixed in a contract between the tax-

payer and the government wherein the government in the same instrument grants the right for which the payments thereunder are paid as is here done. We refer to the three cases chiefly relied on by petitioner. In *Havana Electric Light & Power Co.*, 34 B. T. A. 782, amounts paid to the municipality and province of Havana, Cuba, on net profits derived from the operation of gas works and electric light plants were held to be income tax. However, the opinion states there was no evidence of a franchise or concession from the government for carrying on the business, and it was held that the tax was not payable as a condition of doing business and hence not a franchise or privilege tax. And it also cites a decision by the Supreme Court of Cuba, holding the tax in question was not a privilege tax.

In *Seatrain Lines, Inc.*, 46 B. T. A. 1076, a Cuban levy on gross income obtained from freight and passengers shipped to national ports of Cuba was held an income tax. After discussing the law under which the tax was imposed, its background and reason for its enactment, together with numerous other tax laws of Cuba then in effect, the opinion holds the tax was levied on income and not on the privilege of doing business. Such a conclusion in the pending case we are unable to reach for the reasons heretofore stated.

In *Santa Eulalia Mining Co.*, 2 T. C. 241, a tax on gross income from mining properties in Mexico was held an income tax, the law imposing it being part of a general income tax law which imposed such tax on various groups and classes and specifically in that case on foreigners whose income was derived from sources of wealth within Mexico or from the exploitation of the subsoil, etc.

Respondent relies on *Keasbey & Mattison Co.* v. *Rothensies*, 133 Fed. (2d) 894, which holds that a tax under a Quebec mining act upon the gross income of an asbestos mine, less cost of operation and expenses, was a privilege tax measured on the basis of gross value less allowable deductions. The case at bar is much stronger in respondent's favor, for here the payments in question were not only prescribed or provided for in the mining code (and not in a general income tax law), but were specifically determined and agreed upon in a contract between the Honduran Government and the petitioner and it was under this contract that the petitioner acquired the right or privilege to exploit and operate the mines.

We hold that the amounts paid by petitioner to Honduras were payments for the right and privilege of exploiting and operating particular properties and were not income taxes within the purview of section 131 of our Internal Revenue Code, and that the petitioner is not entitled to a credit therefor on income tax due the United States.

Respondent concedes in his brief filed herein that petitioner is entitled to deduct the payments from its gross income under section 23 (c) of the code, and we so hold.

*Decision will be entered under Rule 50.*