**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**The AMERICAN METAL CO., Limited, Respondent.**

**The AMERICAN METAL CO., Limited, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 29, Docket 22907.**

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1954.

Decided March 15, 1955.

Sullivan & Cromwell, New York City (Norris Darrell, John F. Dooling, Jr., New York City, Robert MacCrate, Port

Washington, N. Y., of counsel), for The American Metal Company, Limited.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, Melva M. Graney, Sp. Assts. to Atty. Gen., for the Commissioner of Internal Revenue.

Before CHASE, MEDINA, and HINCKS, Circuit Judges.

HINCKS, Circuit Judge.

The taxpayer whose petition is before us, is a New York corporation which owns over 98% of the voting stock of Compania Minera de Penoles, S.A., a Mexican corporation (hereinafter referred to as "Minera"). Minera, from 1924 through 1947, has been in the business of mining, milling, smelting and refining non-ferrous metals. In 1934, the smelting and refining operations were carried on by a Mexican corporate subsidiary of Minera, called Metalurgica. In 1947, Minera paid a taxable dividend to its shareholders in United States money in the amount of $8,250,000. Of this amount the taxpayer received $8,110,932.50. The taxpayer filed a consolidated income tax for the year 1947 claiming as credit certain Production Taxes paid by Minera to the Mexican government from 1924 through 1947. The Commissioner allowed a credit for taxes paid by Minera under the Mexican Income Tax Law but refused to allow any credit for the payment to Mexico of so-called Production Taxes as imposed by the Mexican Mining Tax Law.

The taxpayer's petition presents this question: Were the Production Taxes paid by Minera under the Mexican Mining Tax Law income taxes or taxes in lieu of income taxes within the meaning of Section 131(a) (1) or (h) of the Internal Revenue Code, 26 U.S.C.A. § 131(a) (1), (h)? Only if the question requires an affirmative answer is the taxpayer entitled to the credit which it seeks by its pending petition to establish.

In a well reasoned opinion, 19 T.C. 879, the Tax Court held that the Production Taxes in question were not income taxes or taxes in lieu of income taxes within the meaning of I.R.C. Section 131(a) (1) or (h).[1] The taxpayer-petitioner now contends that this holding was erroneous in that the court failed to find and give effect to facts claimed to be fully established by the evidence as follows:

"Mining is in Mexico a main source of the national economy. Under Mexican law, the mineral wealth of the nation is the property of the nation and not of the landowner. The landowner in Mexico has no right to the minerals under his land nor to explore for them; only the one who has received a mining concession from the Government can explore for minerals.

"While the miner in Mexico derives his right to mine by Government concession, that concession confers upon him no ownership in metals or minerals in the earth but only the right to explore for them, and when he has discovered them to turn them to his own account or profit by removing them from the sub-soil. This is so far true that if a mining concessionaire forfeits or surrenders his mining concession,

[1]. I.R.C. "§ 131. *Taxes of foreign countries and possessions of United States*

"(a) *Allowance of credit.* If the taxpayer chooses to have the benefits of this section, the tax imposed by this chapter, except the tax imposed under section 102, shall be credited with:

"(1) *Citizens and domestic corporations.* In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war-profits, and excess-profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States;

\* \* \* \* \*

"(h) *Credit for taxes in lieu of income, etc., taxes.* For the purposes of this section and section 23(c) (1), the term 'income, war-profits, and excess-profits taxes' shall include a tax paid in lieu of a tax upon income, war-profits, or excess-profits otherwise generally imposed by any foreign country or by any possession of the United States. \* \*"

ore that he has broken and left inside the mine is not his property but reverts to the Government of Mexico as its property.

"Customarily, the Mexican miner sells his ore to a smelter or foundry and sells it on the basis of the current New York price of the recoverable metal content of the ore less processing, transportation and commission costs and less the Production Taxes (which are also based on the New York price). The New York price is normally determined by world supply and demand and not by the Production Taxes nor by the Mexican miner's costs which vary from mine to mine between wide extremes.

"'Commercial ore' is material, the value of the recoverable and salable metal of which is such as to yield more than the costs necessary to get the metals in available form.

"Hence, whether a mine will be opened up at all, depends upon the estimated value of the salable metals recoverable from the ore weighed against the estimated cost of working the particular metal-bearing body, including the cost of the property, of opening the mine, and of equipping and operating it and taking into account also the grade of the ore body, the uniformity of that grade, the size of the ore body, its location with relation to transportation facilities, treatment plants and natural land barriers and the type of mining possible with that ore body. Existing mines which have been once opened and worked are not continued in operation unless metal prices are such as to make operation profitable, and declines in market prices of metals result in shutting down mines, while increases in metal prices bring mines that have been shut down back into operation.

"Broadly, price determines whether there is commercial ore in a mine and whether and how long and when the mine will operate. The market prices of the metals occurring in Minera ores varied widely over the years 1924 to 1947; lead ranged from 3¢ a pound to 15¢ a pound, zinc from 2.55¢ a pound to 10½¢ a pound, silver from 25.01¢ an ounce to 90.12¢ an ounce, and copper from 4.91¢ a pound to 22.19¢ a pound. Mining costs, on the other hand, at any point of time, vary widely from mine to mine and in particular vary widely as among the metal mines in Mexico, the variation depending on the type of ore body and the feasible rate of mining, among many other factors.

"Within a single mine where ore of varying grades is found, the richest ore will always be mined first even in an era of abnormally high prices which would enable the miners to extract at a profit those leaner ores in the same mine that could not be mined at a profit when normal metal prices prevail. It is a principle in mining, and a prevalent practice in the industry, that the miners extract the high grade ores first and as quickly as they can up to the limit of their milling capacity and do not in a period of high prices divert to low grade ores.

"Miners do not, in principle, extract ore at all when it cannot be disposed of at a profit, unless some special physical condition makes that imperative and unless they can afford to store the extracted ore pending an expected rise in the market price. Nor are mines generally operated when prices are believed to be temporarily depressed merely because a narrow profit margin appears to be possible at those prices, particularly if the mine is a new one. In such circumstances, the mine would be shut down until prices increased. And so, too, as to opening a new mine, a mine will not be opened up on the basis of a price level believed to be only temporary,

for it takes three to five years to open a mine. On the other hand, metallurgical advances, alone or coupled with price advances, can give minable character to ore once passed over as waste.

"Since a mine is a wasting asset, the life of which is exhausted by extraction of the ore, it is basic in mining that ore will not be removed from the mine at a loss when prices are low."

As to so much of this material not incorporated in the express findings of the Tax Court, we think it fairly apparent from its opinion that it treated all the facts just recited as proved and gave due consideration thereto. However that may be, we will assume for present purposes that the facts above stated were indeed proved. But even on that assumption we hold that the decision of the Tax Court was correct.

The primary objective of Section 131 is to prevent double taxation and a secondary objective is to encourage American foreign trade. See Burnet v. Chicago Portrait Co., 285 U.S. 1, 52 S.Ct. 275, 76 L.Ed. 587. Whether the special and peculiar facts of a given case comes within the meaning of 131(a) (1) or (h) is a question to be determined in the light of the established and settled policy against double income taxation. The pertinent cases hold that the determinative question is "whether the foreign tax is the substantial equivalent of an 'income tax' as that term is understood in the United States." See New York & Honduras Rosario Min. Co. v. Commissioner, 2 Cir., 168 F.2d 745, 747, 12 A.L.R.2d 355; Biddle v. Commissioner, 302 U.S. 573, 58 S.Ct. 379, 82 L.Ed. 431; Keasbey & Mattison Co. v. Rothensies, 3 Cir., 133 F.2d 894.

The Mexican Production Tax is stated in the Mexican Mining Law of 1934 to be one laid "on the production of metals" and "on metal production." It attaches when the ore is extracted from the subsoil, irrespective of its sale or its transportation to a smelter or its further processing. The ores in the earth under Mexican law were part of the patrimony of the sovereign and, as taxpayer's expert testified, "The miner takes them out of that deposit and puts them into the economic current of things, and thereby, to me, he creates wealth. His creation of wealth is what, in my opinion, is subject to the tax." To us that means no more than that the Production Tax is one levied on the privilege of extracting from the sub-soil ore belonging to the nation.

The taxpayer points, on the one hand, to the Mexican Mining Law of 1926 which "restored the ancient work requirement and made it a condition to the continuance of the concession * * * while continuing the Surface Tax in effect," and to the Mining Law of 1934 which from that time forward conditioned the continuance of the miner's "concession on the dual requirement of paying the Surface Tax and working the mine." And, on the other hand, the taxpayer points to the fact, which we accept as proved, that the payment of an accrued Production Tax is *not* a condition to the continuance of the miner's concession. From this it is argued that the Production Tax is not a privilege tax because the Mexican Mining Law imposes as the price of the miner's privilege "the performance of the work requirement and the payment of the Surface Tax."

We think this argument specious. Forfeiture of the privilege for non-payment is not the exclusive badge of a privilege tax. Whether, for present purposes, the Production Tax is a privilege tax must depend not upon forfeiture conditioned on non-payment nor upon the absence of label in the enacting law,—but upon the nature and effect of the tax. Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389. Indeed the Surface Tax, which is imposed by Chapter II of the Mining Law and which the taxpayer for purpose of this argument seems to classify as a privilege tax is not so labelled. It is based on the area of the concession: for a concession exceeding

one hundred claims it imposes a tax of only $15 annually per claim. And the "work requirement," which constitutes the other condition to the concession, is described by taxpayer's expert in Mexican law as the subject matter of ordinances requiring "that four men at least should be employed for a minimum time during each year working in the mine." The mere fact that the miner's concession is thus conditioned on a "price" based on area and a minimum work requirement does not mean that the Production Tax, which is based "on the production of metals" in the ore belonging to the sovereign which the miner extracts and thereby is allowed to appropriate, is other than a privilege tax.

In this connection, the taxpayer relies on our decision in New York & Honduras Rosario Min. Co. v. Commissioner, 2 Cir., 168 F.2d 745. It is true that in that opinion we thought it "not without significance" that under the Honduras Mining Code genuine excise taxes, somewhat similar to the Mexican "Surface Tax," were imposed in addition to the "income tax" also imposed. However, the determinative factor which lead us to classify the tax there in question as an "income tax", we stated as follows: "It is not laid on value of the minerals mined but on 'the amount received from its exports,' i. e. gross income, less operating expenses within Honduras and expenses abroad directly applicable to management of the mines, plus reasonable deductions for amortization and depletion." The characteristics of the Production Tax here involved are essentially antithetical to those of the Honduran income tax. And the fact that ore belonging to the nation is released to the miner who is subject to the tax forthwith upon the extraction of the ore, marks the Mexican Production Tax more clearly and certainly as a privilege tax than the Quebec tax which was held to be an excise tax in Keasbey & Mattison Co. v. Rothensies, 3 Cir., 133 F.2d 894, certiorari denied 320 U.S. 739, 64 S.Ct. 39, 88 L.Ed. 438, which cites numerous cases which lend still further support to our conclusion.

The fact that Mexican law imposes one privilege tax, the Surface Tax, no more imports that the Production Tax or other taxes are *not* also privilege taxes than the presence in the Mexican Tax structure of an income tax law imports that the Production Tax is not an income tax.

Our conclusion is not shaken by the taxpayer's ingenious argument that in effect the Production Tax is the equivalent of a tax on the proceeds of mining operations. The argument is based upon American cases which hold, for purposes of domestic taxation, that the *proceeds* of mining constitute gross income as distinguished from a return of invested capital. We think such cases wholly irrelevant to the problem here presented. For the Mexican Production Tax is *not* imposed on the proceeds of mining. Again it is necessary to point out that it is imposed on the privilege of extracting the ore irrespective of the realization of cash proceeds.

In this connection the taxpayer relies especially on Stratton's Independence v. Howbert, 231 U.S. 399, 34 S.Ct. 136, 142, 58 L.Ed. 285, in which the court was concerned with our federal Corporation Tax Law of 1909, 36 Stat. 11, 112, which imposed an excise tax on the privilege of doing business in a corporate capacity, the tax being measured by the taxpayer's " 'entire net income' " as defined. As the taxpayer here points out, the court did indeed hold that the entire proceeds of mining were income without deduction on account of the value of the ore *in situ* which after extraction had been converted into proceeds. In this aspect the case seems to support the argument that extracted ore is income in kind irrespective of its realization as cash income. But the taxpayer seems to overlook the fact that that tax, enacted in 1909 prior to the Sixteenth Amendment, was sustained as an *excise* tax and not as an income tax over the contention that in effect it was the "equivalent to a di-

rect tax upon the property, and hence unconstitutional." The court held that the tax was none the less an excise tax because Congress, in ad•pting "income as the measure of the tax * * * desired that the excise should be imposed, approximately at least, with regard to the amount of benefit presumably derived by such corporations from the current operations of the government." By a parity of reasoning, we think the Supreme Court would hold that the Mexican Production Tax was an excise tax even though its measure was such as to reflect, at least approximately, "the amount of benefit presumably derived" by the taxpayers from appropriating to themselves a portion of the national patrimony. Thus the real thrust of the case is destructive of this branch of the taxpayer's argument.

The taxpayer further contends that the Production Taxes are income taxes "of a formulary kind." He argues that the Production Tax is characterized as an income tax at least in part because of its "profit objective" as affecting the mining industry. It is true that under the statutory scheme the rate of tax applicable to the metal severed varies progressively with the price of the metal in the world market. Since obviously the price of the metal affects the miner's profit we agree that the proofs establish a legislative intent that the contribution of the mining industry to the national economy should vary with a factor which affects the prosperity of the industry generally. Let it be granted that the state in fixing the tax rate sought to obtain as much tax income as could be done without killing the goose that laid the golden egg. Nevertheless, this does not mean that the Production Tax is one on the profits of the miner. For as already noted it attaches even if the individual miner makes no profits,---even if, having severed the ore, he makes no sales. More truly, we think, this incident of the tax scheme betokens an intent that the price of the privilege granted the miner shall vary with the value of the privilege measured both by the loss of the ore to

the state which grants the privilege and the acquisition of the ore by the miner. Merely because the state charges more for the release of its ore when the value thereof is high does not mean that the charge is a tax on the miner's profits.

The taxpayer seeks further to buttress this line of argument by pointing to the fact that the Production Taxes provide discounts for low grade ores, special discounts which recognize the extraordinary cost of extraction in the case ..of gold and silver found in zinc concentrates, and temporary discounts given to new and newly reopened mines the working of which involve extraordinary expense. But these, too, are factors which affect the value of the privilege. Their presence in the tax scheme is not so much indicative of legislative intent to tax the miner's profits as of intent to realize, through a privilege tax, on a natural asset on a basis which at least approximately reflects its current value.

Nor has the taxpayer succeeded in demonstrating that the Production Tax is a "formulary" income tax because it "compliments" the Mexican Income Tax law. It is true, as it points out (although in another connection), that the overall tax scheme of Mexico includes an income tax,—one which satisfies the the American concept of an income tax. Schedule I of this tax law taxes income derived from capital and personal effort invested in industry, commerce and agriculture; income from personal effort being taxed at the lowest rate, income from investments at the highest rate, and income from combined capital and labor at an intermediate rate. The tax under this Schedule is a tax on gross income less authorized deductions but although applicable to miners—as are also Schedules II and III—allows no deductions for depletion. Furthermore, we accept as proved the taxpayer's assertion that except for mining enterprises the tax under Schedule I is imposed at a higher rate on businesses which require a concession from the state. If on such facts it had been shown that the impact of the Production Tax on miners was

substantially the same as the differential between the income tax on miners and the income tax on other industries operating under government concessions or even that the Production Tax was imposed to ·equalize this differential in the income tax law, there would be more room for the conclusion that the Production Tax was what taxpayer calls a "formulary" income tax within the reach of the holding in Seatrain Lines, Inc., v. Commissioner, 46 B.T.A. 1076, which the taxpayer cites to. the point.

But such evidence is lacking here. At most, we have the conclusion of the taxpayer's Mexican tax expert that the special tax rate provided by Schedule I for application to business operating under government concessions was not made to apply to businesses enjoying a mining concession "because it is deemed that those concerns, mining concerns pay an *additional* tax which is *complimentary* of the income tax." (Emphasis supplied.) This, we think, wholly inadequate to bring the Production Tax within the Seatrain doctrine even assuming, as we do, that the "additional tax" to which the ·expert referred was the Production Tax. This vague · language of the expert, we think, may not be taken as proof that the Production Tax was substantially effective ·or even designed to equalize differentials in the impact of Mexican laws taxing income or to serve administrative convenience in the computation of a tax on income. It is by no means clear to us that by "complimentary" the taxpayer's expert meant any more than "additional" or supplementary. However that may be, such conclusionary testimony is inadequate to support the taxpayer's contention that the Production Tax has the essential characteristics of our American income tax. Certainly it is vitally different from the Cuban Tax with which the Seatrain case was concerned. And Keen v. Commissioner, 15 B.T.A. 1243, which taxpayer also cites to this point, we think in conflict with the later decision of the Supreme Court in Biddle v. Commissioner, supra.

What has been said, we think, sufficiently disposes of taxpayer's final contention that the Production Tax is at least one "paid in lieu of a tax upon income" within the meaning of that provision of the Revenue Act of 1942 which is now incorporated in I.R.C. Section 131(h). We do not need to decide whether, as taxpayer claims, Regulation 111, Section 29.131-2 is unduly restrictive of the 1942 amendment, the liberalizing objective of which we fully recognize. For the reasoning which has lead us to classify the Production Tax as an excise, not an income, tax equally requires the conclusion that it has not been shown to be a tax "in lieu of a tax upon income." We so hold.

◼ This brings us to the Commissioner's petition to review the holding of the Tax Court that the credit to which the taxpayer was concededly entitled on account of Minera's payment of income taxes to Mexico in past years had not been improperly computed in that, in the computation, said tax payments had not been discounted to reflect the rate of exchange prevailing in 1947 when Minera's dividend was paid to the taxpayer.

The Commissioner takes the position that Section 131(a), which creates the credit, allows it only to the extent of "the amount of any income * * * taxes paid * * * during the taxable year to any foreign country * * *." He contends that in so providing Section 131 creates a statutory presumption that the income taxes paid by Minera in prior years were paid by the taxpayer *in the taxable year*. This, he contends, requires that, in computing the credit allowable in this case, the taxes paid by Minera to Mexico in pesos in former years should be discounted to reflect the rate of exchange prevailing in the taxable year when the dividend was paid.

I.R.C. Section 131, which in paragraph (a) (1) authorizes the credit, contains in

paragraph (f) (1) thereof [2] the formula for its computation in cases in which a domestic taxpayer corporation shall have received dividends in any taxable year from a foreign subsidiary corporation which has paid income taxes to a foreign country. The formula provides that the domestic corporation "shall be deemed to have paid the same proportion of any income * * * taxes paid * * * by such foreign corporation * * *, upon or with respect to the accumulated profits of such foreign corporation from which such dividends were paid, which the amount of such dividends bears to the amount of such accumulated profits." Paragraph (f) further provides that the dividend paid by the foreign subsidiary shall be treated "as having been paid from the accumulated profits of the preceding *year or years*" and "as having been paid from the most recently accumulated gains, profits, or earnings" of the foreign subsidiary. Thus paragraph (f) clearly imports that the allowable credit is not restricted to foreign taxes paid by the subsidiary *in the taxable year* in which the dividend was received by the domestic parent. Instead, the credit is measured by a defined proportion of the foreign income taxes paid upon "the *accumulated profits* of such foreign corporation *from which such dividends were paid.*" Consequently, foreign income taxes paid in prior years may be reflected in the allowable credit if they had been imposed on the accumulated profits from which the dividend was deemed to have been paid. We do not understand the Commissioner to dispute this: his contention is limited, as above indicated, to the method of computing the credit for the foreign income taxes paid in prior years.

It seems to us that the gist of the formula of paragraph (f) is the prescribed relationship between the *foreign tax paid* by the foreign subsidiary and its *accumulated profits* from which the dividend was paid and upon which the tax paid was imposed as that relationship existed when the taxes were paid and the profits were deemed to have been accumulated; and that, in the case of a foreign subsidiary conducting its business in foreign currency for purposes of computing the credit under Section 131 both these factors of the relationship must be expressed in terms of the same currency. If that be done, it will not affect the result whether the rate of exchange be that prevailing when the foreign tax was paid and the relevant profits accumulated or that prevailing when the dividend was paid by the foreign subsidiary to its domestic parent.

However, that problem is not presented here. Minera's dividend to the taxpayer was paid in dollars and throughout all the years involved it conducted its business on the basis of the American dollar. Not only were its profits accumulated on

---

2. I.R.C. Section 131.
"* * * (f) *Taxes of foreign subsidiary.*
"(1) *Foreign subsidiary of domestic corporation.* For the purposes of this section, a domestic corporation which owns a majority of the voting stock of a foreign corporation from which it receives dividends in any taxable year shall be deemed to have paid the same proportion of any income, war-profits, or excess-profits taxes paid or deemed to be paid by such foreign corporation to any foreign country or to any possession of the United States, upon or with respect to the accumulated profits of such foreign corporation from which such dividends were paid, which the amount of such dividends bears to the amount of such accumulated profits. The term 'accumulated profits' when used in this subsection in reference to a foreign corporation, means the amount of its gains, profits, or income in excess of the income, war-profits, and excess-profits taxes imposed upon or with respect to such profits or income; and the Commissioner with the approval of the Secretary shall have full power to determine from the accumulated profits of what year or years such dividends were paid; treating dividends paid in the first sixty days of any year as having been paid from the accumulated profits of the preceding year or years (unless to his satisfaction shown otherwise), and in other respects treating dividends as having been paid from the most recently accumulated gains, profits, or earnings."

that basis but also the taxes which it paid to Mexico. It is true that its tax payments to Mexico were made in pesos but the pesos used for this purpose, like pesos expended for other purposes, were obtained by converting American dollars into pesos at the contemporary rate of exchange. And such income items as it received in pesos were similarly converted into dollars and so recorded on its books. As a result, we fully agree with the Tax Court that no problem in foreign exchange is presented which requires solution for the computation of the allowable credit.

We conclude that the Tax Court was right in its decision of the questions raised by both petitions.

Affirmed.