BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, A NATIONAL BANKING ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3568–71. Filed March 18, 1974.

*Harry R. Horrow* and *Stephen J. Martin,* for the petitioner.
*Vernon R. Balmes,* for the respondent.

TANNENWALD, *Judge:* Respondent has determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
|------|-----------|
| 1965 | $1, 202, 390. 96 |
| 1966 | 1, 245, 141. 15 |

There are two questions presented for decision:

(1) Whether petitioner is collaterally estopped from arguing that the Thailand business tax, the Philippines tax on banks, and the City of Buenos Aires tax on profit-making activities are "income * * * taxes" within the meaning of section 901(b) (1) ; [1] and

(2) Whether the Thailand business tax, the Philippines tax on banks, the City of Buenos Aires tax on profit-making activities, and the Republic of China (Taiwan) business tax qualify for the foreign tax credit under sections 901(a) and 901(b) (1).

### FINDINGS OF FACT

This case was fully stipulated pursuant to Rule 30 (now Rule 122), Tax Court Rules of Practice and Procedure.

Petitioner was and now is a national banking association duly organized and existing under the laws of the United States, with its principal office in San Francisco, Calif., at the time the petition herein was filed. For the taxable years 1965 and 1966, it filed its Federal income tax returns with the district director of internal revenue in San Francisco.

In the years 1959, 1960, 1961, 1965, and 1966, petitioner conducted a general banking business from branches in Buenos Aires, Argentina; Manila, Republic of the Philippines; Bangkok, the Kingdom of Thailand; and Taipei, Republic of China (Taiwan). This business included, but was not limited to, the making of commercial, real estate, and personal installment loans, the rendering of trust department and property management services, foreign exchange transactions, the issuance of letters of credit, guarantees, traveler's checks, and cashier's checks, and acceptance of trade papers. In each country referred to above, foreign taxes were imposed upon and paid by petitioner in foreign currencies. Since there is no dispute between the parties as to conversion rates from said currencies to United States dollars, we have accepted the stipulations of the parties and will refer to all amounts solely in terms of the latter.

*Taiwan.*—For the years 1965 and 1966, petitioner had a net loss of $44,240.17 and net income of $252,298.31, respectively, from its Taipei

---

[1] Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.

branch. In these years, petitioner accrued and paid the following taxes imposed on its Taipei branch by the laws of Taiwan:

| | 1965 | 1966 |
|---|---|---|
| Income tax law ch. III ("Profit-Seeking-Enterprise Income Tax") | $7, 536. 22 | $51, 114. 33 |
| Business tax law, ch. I ("Business Tax") | 9, 812. 13 | 32, 920. 80 |
| Total | 17, 348. 35 | 84, 035. 13 |

The profit-seeking enterprise income tax was the generally imposed income tax payable by corporations doing business in Taiwan for the years 1965 and 1966.[2] In computing its net or taxable income subject to the profit-seeking enterprise income tax, petitioner claimed and was allowed a deduction for the amount of the business tax which it paid. Under the profit-seeking enterprise income tax, the tax is assessed as a percentage of the "Profit-Seeking Enterprise Income Amount" (ch. III, sec. 3, Income Tax Law) defined in article 24 as follows:

The amount of income of a profit-seeking enterprise shall be the net income, i.e., the gross yearly income after deduction of all costs, expenses, losses and other taxes.

The business tax is separate and distinct from the income tax and provides, in pertinent part, as follows:

ARTICLE 1

Any public or private enterprise or any enterprise jointly operated by public and private for profit-seeking purposes shall be subject to the business tax collectible under this Law by provincial governments or governments of the municipalities under direct jurisdiction of the Executive Yuan (hereinafter referred to as municipalities).

The provisions of this Law shall be applicable to organizations or societies and their operational agencies which conduct business with the general public.

ARTICLE 2

In collecting the business tax, provinces and municipalities shall be confined to their respective jurisdictional areas, and the tax shall be levied according to the business amount of a profit-seeking enterprise on the basis of the Table of Items Subject to Business Tax of this Law. * * *

\* \* \* \* \* \* \*

ARTICLE 4

* * * if a foreign profit-seeking enterprise has its branch office within the territory of the Republic of China, the business tax shall be levied on the amount of the business conducted within the territory of the Republic of China.

\* \* \* \* \* \* \*

---

[2] There is no evidence as to whether any of these taxes were in effect and imposed on petitioner in 1959, 1960, and 1961.

ARTICLE 5

Rates of the business tax are classified into the following four categories according to the Table of Items Subject to Business Tax of this Law:

\*      \*      \*      \*      \*      \*      \*

4. Items under Category IV of the said Table shall be taxed at not lower than 3.5 percent but not higher than 6 percent of the business amount.

Category IV of the table of items subject to business tax includes the banking business and provides that its taxable items are: (1) Interest on loans, remittances, and discounted bills; (2) remittance charges, commissions, handling charges, or remuneration; (3) warehouse charges, house rents, or custody charges; and (4) proceeds from selling silver, gold, and foreign currencies.

The parties agree that the profit-seeking enterprise income tax is creditable and the only tax presently in dispute is the business tax.

*Thailand.*—In 1965 and 1966, petitioner's net income for its Bangkok branch was $683,715.04 and $1,136,247.40, respectively. Petitioner accrued and paid to Thailand, as taxes imposed on the branch's operations, the following taxes pursuant to the Revenue Code and laws of Thailand:

|  | 1965 | 1966 |
|---|---|---|
| Revenue Code, sec. 65, div. 3, ch. IV, tit. II ("Companies Income Tax") | $131, 707. 07 | $213, 381. 20 |
| Revenue Code, sec. 70, bis ("Profit Remittance Tax") | 21, 927. 90 | 18, 083. 15 |
| Revenue Code, sec. 78. div. 1, ch. IV, Category 12 of Business Tax Schedule ("Business Tax"): |  |  |
| Type 1 | 29, 713. 90 | 38, 473. 98 |
| Type 2 | 37, 229. 19 | 57, 870. 17 |
| Thailand municipal tax | 6, 694. 31 | 9, 634. 42 |
| Total | 227, 272. 37 | 337, 442. 92 |

Of these taxes, the only one presently in dispute is the business tax.

The companies income tax was generally imposed on the incomes of all corporations operating in the Kingdom of Thailand for each of the years 1959, 1960, 1961, 1965, and 1966. In computing its income subject to this tax, petitioner was allowed deductions for the amount of business tax which it paid.

The business tax, also imposed for each of said years, is set forth in chapter IV of the Revenue Code of Thailand. Section 78 of this Code states that persons engaged in any business listed in the business tax rate schedule "have the duty to pay business tax on the gross takings for each tax month" at the rates provided in the schedule. Petitioner qualifies as a "Banking Business" under this schedule. "Gross takings" from a banking business is defined by section 79 as "(a) interest, dis-

counts, fees or service charges, and (b) profit, before the deduction of any expense, from the exchange, purchase or sale of currency, issuance, purchase or sale of notes or foreign remittances."

The business tax rate schedule levies taxes at different rates, depending on the source of the income. It describes the rates and categories as follows:

Type. 1. Interest, discounts, fees or service charges. (Rate of tax is 2.5 percent of gross takings.)

Type 2. Profit before the deduction of any expenditure from the exchange, purchase or sale of notes or foreign remittances. (Rate of tax is 10.5 percent of gross takings.)

*Philippines.*—For the years 1965 and 1966, petitioner's Manila branch had net income of $2,399,651.20 and $2,853,646.99, respectively. Petitioner accrued and paid to the Republic of the Philippines, as taxes imposed on its Manila branch operations by the National Internal Revenue Code and laws of said Republic for 1965 and 1966, the following taxes:

|  | 1965 | 1966 |
|---|---|---|
| National Internal Revenue Code, sec. 24(b), ch. 3, tit. II ("Tax on Foreign Corporations") and foreign income taxes withheld | $679, 720. 04 | $827, 192. 99 |
| National Internal Revenue Code, sec. 249 of tit. VIII ("Tax on Banks") | 164, 743. 98 | 196, 307. 42 |
| Sec. 2 of Commonwealth Act No. 465 ("Residence Tax") | 514. 10 | 514. 10 |
| Total | 844, 978. 12 | 1, 024, 014. 51 |

Of the above taxes, the only one presently in issue is the tax on banks. As to this tax, the Philippines National Internal Revenue Code provides, in pertinent part, as follows:

Sec. 249. *Tax on banks.*—There shall be collected a tax of five *per centum* on the gross receipts derived by all banks doing business in the Philippines from interests, discounts, dividends, commissions, profits from exchange, royalties, rentals of property, real and personal, and all other items treated as gross income under section twenty-nine of this Code.

Sec. 29. Gross income.—(a) *General definition.*—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, sales, or dealings in property, whether real or personal, growing out of the ownership or use of interest in such property; also from interests, rents, individuals, securities, or the transactions of any business carried on for gain or profit, or gains, profits, and income derived from any source whatever.

The tax on foreign corporations was generally imposed by the Republic of the Philippines on the incomes of all foreign corporations doing business there for each of the years 1959, 1960, 1961, 1965, and

1966. The tax on banks was imposed separate from, and in addition to, the tax on foreign corporations, for each of these years. Petitioner was not exempt from payment of the tax on foreign corporations for any of these years, and for each year petitioner claimed and was allowed a deduction, in computing its net or taxable income subject to the tax on foreign corporations, for the amount of the tax on banks which it paid.

*Argentina.*—Petitioner's net income for 1965 and 1966, for its Buenos Aires, Argentina, branch, was $1,187,456.35 and $1,219,289.28, respectively. Petitioner accrued and paid to the Argentine Republic and the City of Buenos Aires, for this branch's operations, the following taxes, pursuant to the laws of the respective jurisdictions:

|  | 1965 | 1966 |
|---|---|---|
| Corporation income tax (law No. 11,682) and emergency tax | $516, 325. 09 | $495, 739. 09 |
| Tax in substitution of surcharge on free transfer of property (law No. 14060, Integrated Text of 1960) | 9, 983. 44 | 11, 208. 87 |
| City of Buenos Aires tax on profit-making activities (decree-law No. 141/59) | 16, 721. 78 | 31, 089. 74 |
| Contribution to the bankers' institute for social services (decree-law No. 20.714/56) | 42, 497. 22 | 44, 214. 27 |
| Total | 585, 527. 53 | 582, 251. 97 |

The only Argentine tax presently in issue is the City of Buenos Aires tax on profit-making activities.

For the years 1961, 1965, and 1966,[3] the corporation income tax was the generally imposed income tax payable by corporations doing business in the Argentine Republic. For these years, the City of Buenos Aires tax on profit-making activities was a tax imposed by the City of Buenos Aires and was separate and apart from, and in addition to, the corporation income tax which was imposed by the national government. For the years 1961, 1965, and 1966, petitioner was not exempt from payment of the corporation income tax, but petitioner claimed and was allowed deductions, in computing its net or taxable income subject to the corporation income tax, for the amount of the City of Buenos Aires tax on profit-making activities which it paid.

The City of Buenos Aires tax on profit-making activities was a tax levied on petitioner's gross receipts. The relevant sections of that law provide, in part, as follows:

### THE TAX BASE

ART. 115

\*　　\*　　\*　　\*　　\*　　\*　　\*

---

[3] As before (see fn. 2 *supra*), there is no evidence in the record to enlighten us as to the taxes imposed on petitioner in Argentina for 1959 and 1960.

In the case of banks, insurance, savings and loan and security and investment companies, the tax levied shall be computed on the basis of gross receipts obtained during the business years which ended during the first preceding calendar year.

ART. 121

In the case of banks and other lending institutions which are governed by banking legislation and its supplementary provisions, the taxable amount shall be composed of interest, discounts, profits from non-exempt taxable securities and other revenue, resulting from profits and remuneration for services received in the course of the last business year.

For the taxable years 1965 and 1966, petitioner prepared its tax returns, in general, under the accrual method of accounting. On these returns, petitioner elected to credit the four taxes in issue pursuant to section 901 rather than to take a deduction as provided in section 164. It calculated its foreign tax credit on the basis of the overall limitation specified in section 904(a)(2). As to each of the taxes in issue, the respondent disallowed a credit but allowed a deduction in lieu thereof. Other taxes paid by petitioner and denied credit status by respondent are not presently before us for decision due to extrajudicial settlement by the parties.

In 1968 and 1969, petitioner filed petitions in the United States Court of Claims seeking refunds on its income taxes paid for taxable years 1959, 1960, and 1961 because the Internal Revenue Service had held certain foreign taxes paid by petitioner, including the Philippines tax on banks, the City of Buenos Aires tax on profit-making activities, and the Thailand business tax, type 1 and type 2, to be noncreditable under section 901.[4] These refunds were denied by the Court of Claims in *Bank of America National T. & S. Assn.* v. *United States*, 459 F.2d 513, on May 12, 1972. The Taiwan business tax was not involved in the litigation before the Court of Claims.

The provisions imposing the Thailand business tax, type 1 and type 2, the Thailand companies income tax, the Philippines tax on foreign corporations, and the Philippines tax on banks in effect during the years 1959, 1960, and 1961 remained substantially unchanged for the years 1965 and 1966. The City of Buenos Aires tax on profit-making activities and the Argentine corporation income tax in effect during 1961 remained unchanged for the years 1965 and 1966.

OPINION

Section 901(b)(1) provides that, subject to certain limitations not applicable herein, a credit against Federal income tax will be allowed

---

[4] The Court of Claims was concerned with taxes paid to Thailand and the Philippines for 1959, 1960, and 1961 and to the City of Buenos Aires for 1961.

for "the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country." The issue before us is whether the petitioner is entitled to the benefit of that section in respect of four taxes, described in our Findings of Fact: the Thailand business tax, types 1 and 2; the Philippines tax on banks; the City of Buenos Aires tax on profit-making activities;[5] and the Republic of China (Taiwan) business tax.

The availability to this petitioner in prior taxable years of the foreign tax credit for the first three taxes has already been considered by the Court of Claims, which resolved the issue against the allowance of the credit. *Bank of America National T. & S. Assn.* v. *United States*, 459 F.2d 513 (Ct. Cl. 1972), certiorari denied 409 U.S. 949 (1972). Given the stipulation of the parties that there were no significant changes in the applicability and operation of those taxes in respect of the petitioner herein during the taxable years before us and the fact that the Taiwan tax is substantially identical to those taxes in its applicability and operation, we can readily dispose of this case if our analysis of the governing legal principles coincides, as it does, with that of the Court of Claims. Thus, we have no need to explore the nuances of the application of the doctrine of collateral estoppel to the Thailand, Philippine, and Buenos Aires taxes, a doctrine upon which respondent stakes out his first line of defense.

The reaches of the word "income" in section 901(b)(1) have been the subject of a long and tortuous history in terms of legislative background, the decided cases, and respondent's rulings. See Owens, Foreign Tax Credit 36–60 (1961); Bittker & Ebb, United States Taxation of Foreign Income and Foreign Persons 230–249 (2d ed. 1968); Surrey, "Current Issues in the Taxation of Corporate Foreign Investment," 56 Col. L. Rev. 815, 819–822 (1956); Note, "Characterization of an Income Tax for the Purpose of the Foreign Tax Credit," 14 Vanderbilt L. Rev. 1469, et seq. (1961); Comment, "The Limitless Limits of the Foreign Tax Credit," 45 Wash. L. Rev. 347, 353–356 (1970). The textual fabric of the word, not unlike other words and phrases in the tax law, "bleeds" madras-like (see *Henry McK. Haserot*, 46 T.C. 864, 865 (1966), affirmed sub nom. *Commissioner* v. *Stickney*, 399 F.2d 828 (C.A. 6, 1968)). It would serve no useful purpose for us to regurgitate that history and the vagaries, confusion, and seeming contradictions with which it is permeated. Judge Davis' opinion in the Court of Claims constitutes a thorough and lucid analysis and distills a basic guiding principle which is fully consistent with the factual foundations, if not with every facet of the articulations, of the decided

---

[5] Respondent makes no claim that the City of Buenos Aires does not satisfy the "foreign country" requirement of sec. 901(b)(1). See sec. 1.901–2(b), Income Tax Regs.

cases. We think it sufficient for us to record that we agree with that guiding principle and to append some additional considerations which have influenced us.

As a prelude to our exegesis, we note that the parties have not seriously contested that any of the taxes herein involved is a privilege, excise, turnover, or similar type of tax, although respondent does suggest for the first time in his reply brief that they should be considered in the nature of privilege taxes and noncreditable on that ground. See and compare cases collected in *Bank of America National T. & S. Ass'n* v. *United States*, 459 F.2d at 518, fn. 6. Additionally, we note that the parties have treated such taxes as gross income rather than gross receipts taxes, although it would appear that they all fall in the latter category not only as they are applied to banks but to other businesses as well. Thus, the specific question posed herein is, as it was posed and answered by the Court of Claims in *Bank of America:* should the phrase "income * * * taxes" in section 901(b)(1) be construed to include gross income taxes or should it be accorded a more limited meaning? See and compare *Doyle* v. *Mitchell Bros. Co.*, 247 U.S. 179 (1918); *Allstate Ins. Co.* v. *United States*, 419 F.2d 409, 414 (Ct .Cl. 1969).

In answering that question, the Court of Claims initially established certain basic propositions: (1) "an income tax is a direct tax on gain or profits, and * * * gain is a necessary ingredient of income" (see 459 F. 2d at 517); (2) "Congress has always directed the domestic levy at some net gain or profit, and for almost 60 years the concept that the income tax seeks out net gain has been inherent in our system of taxation" (see 459 F. 2d at 518); and (3) the "basic" test for determining whether a foreign tax is creditable is whether it is the substantial equivalent of an "income tax" as revealed by an examination of our statutes (id.). The Court of Claims then proceeded to distill the governing test that—

the term "income tax" in § 901(b)(1) covers all foreign income taxes designed to fall on some net gain or profit, and includes a gross income tax if, but only if, that impost is almost sure, or very likely, to reach some net gain because costs or expenses will not be so high as to offset the net profit. [Fn. omitted. See 459 F. 2d at 523.]

We are persuaded that this test is the proper one to apply, that none of the taxes herein satisfy this test, and that consequently petitioner cannot prevail. In so concluding, we dismiss, as the Court of Claims did (see 459 F. 2d at 522–523), petitioner's contention that since a few United States taxes are imposed on gross income (e.g., those involving the taxation of nonresident aliens on income from sources within the United States during the years in question and

prior to the enactment of the Foreign Investors Tax Act of 1966, the alternative capital gains tax, and social security taxes) a sufficient foundation exists for concluding that the phrase "income * * * taxes" contained in section 901(b)(1) is keyed, under the United States tax system, to a "gross income" concept. We believe that, in those limited situations, the related costs, expenses, and losses would almost always be less than the income being taxed so that it can be said that the thrust of the United States levy is realistically directed against net gain or profit. We need not now decide whether taxes such as are involved herein might become creditable at some future date when and if the United States should adopt a general gross income levy.[6] We similarly dismiss as irrelevant (see 459 F. 2d at 518) that portion of petitioner's argument based upon the proposition that the fact that the Congress has the *power* to levy a tax on gross income (cf. *Penn Mutual Indemnity Co.*, 32 T.C. 653, 660 (1959), affd. 277 F. 2d 16 (C.A. 3, 1960)) indicates that a gross income tax is creditable under section 901(b)(1). The test of creditability rests not upon the power to tax but upon the manner in which that power is exercised.

Our conclusion that the taxes involved herein are not creditable is reinforced by the fact that section 901(b)(1) speaks in terms of "income, war *profits* and excess *profits* taxes." (Emphasis added.) The italicized word "profits" is a clear statutory indication that the thrust of the section is in terms of net gain. In this context, we consider the principle of noscitur a sociis particularly apt. As the Supreme Court said in *Jarecki* v. *G. D. Searle & Co.*, 367 U.S. 303, 307 (1961),

The maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.

Moreover, we think further support can be marshalled from the existence of the "in lieu of" section 903.[7] In enacting that section, Congress was concerned that the provisions of section 901(b)(1) provided too narrow a base for determining the availability of the foreign tax credit and that such credit should be allowed for a tax imposed as a substitute for a net income tax even though measured by gross income.[8] See *Motland* v. *United States*, 192 F. Supp. 358 (N.D. Iowa

---

[6] A partial, but, in our opinion, insufficient move in this direction has taken place in the form of the minimum tax, applicable to years subsequent to those involved herein. Secs. 56 through 58.

[7] SEC. 903. CREDIT FOR TAXES IN LIEU OF INCOME, ETC., TAXES.

For purposes of this subpart and of sections 164(a) and 257(a), the term "income, war profits, and excess profits taxes" shall include a tax paid in lieu of a tax on income, war profits, or excess profits otherwise generally imposed by any foreign country or by any possession of the United States.

[8] Petitioner makes no argument that the provisions of sec. 903 are applicable herein nor could it in view of the fact that all four countries involved imposed a separate tax on net income.

1961), for a detailed review of the legislative history of section 903. Certainly it would have been more logical for Congress to have explicitly defined the word "income" in section 901(b)(1) if it had intended to give that word an expansive meaning, rather than to carve out a limited exception through the vehicle of section 903.

None of our prior decisions in this area are contrary to the position we are taking herein. In *Seatrain Lines, Inc.*, 46 B.T.A. 1076 (1942), the Cuban tax was clearly directed at net profit with the measure, in the case of the particular type of taxpayer, based upon gross income and an assumed level of expenses. It thus represents no more than a judicial anticipation of the "in lieu of" provision presently embodied in section 903—a so-called "formulary income tax." See *Commissioner* v. *American Metal Co.*, 221 F. 2d 134, 140 (C.A. 2, 1955), affirming 19 T.C. 879 (1953). As far as *Santa Eulalia Mining Co.*, 2 T.C. 241 (1943), is concerned, that case is distinguishable principally on the ground that the Mexican tax involved therein was imposed on an amount of royalties determined *after* the deduction of operating costs, so that, in point of fact, net gain was being reached—an element to which this Court itself referred. See 2 T.C. at 245. With respect to *New York & Honduras Rosario Mining Co.*, 8 T.C. 1232 (1947), revd. 168 F. 2d 745 (C.A. 2, 1948), that case involved "liquid profits" which were determined after the allowance of all expenses except salaries and expenses of members of the board of directors, i.e., the tax was directed at net gain or profit.[9] To the extent that there is language which seems to favor petitioner's position in *Seatrain* and *Santa Eulalia*, we need do no more than record our unwillingness to follow such dicta and to point to the fact that they are inconsistent with a more recent observation of this Court in *F. W. Woolworth Co.*, 54 T.C. 1233, 1260 (1970): "the United States concept of 'income' is based upon gain or profit realized by the taxpayer (i.e., net income as opposed to gross income, gross sales, or some other basis)."

We recognize that "we cannot claim infallibility in mapping the 'heavenly city of legislative intention.'" See *Elmer L. Reese, Jr.*, 45 T.C. 407, 415 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967). But we are satisfied that our position and rationale herein "comports better with the dominant purpose of the [foreign tax] credit to avoid or minimize double taxation of income." See *Bank of America National T. & S. Assn.* v. *United States*, 459 F. 2d at 519, and cases cited thereat. Perhaps the test which we and the Court of Claims have articulated will not provide that magic touchstone whereby every situa-

---

[9] The decision of this Court rested upon the ground that the tax involved was a tax on the privilege of mining. Its reversal was accepted and the case distinguished in *Northwestern Mutual Fire Association*, 12 T.C. 498, 504 (1949), reversed on other grounds 181 F. 2d 133 (C.A. 9, 1950).

tion in this area can be precisely located in the spectrum of foreign taxes ranging from pure net income taxes on one end to pure excise, sales, or privilege taxes on the other. But we are convinced that the test is not "manufactured out of whole cloth," as petitioner would have us believe, and that it provides a rational and manageable basis for interpretation of section 901(b)(1), consistent with the statutory language and purpose and with the previously decided cases. In such fashion have we discharged our task of introducing "some certitude in a landscape of shifting sands." See *United States* v. *Rhode Island Hospital Trust Co.*, 355 F. 2d 7, 10 (C.A. 1, 1966).

*Decision will be entered under Rule 155.*