EITINGON-SCHILD CO., INC., AND SUBSIDIARIES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 34128, 36930, 47114. Promulgated January 15, 1931.

1164

*Richard S. Holmes, Esq.*, for the petitioners.
*Maxwell E. McDowell, Esq.*, for the respondent.

1166

1168

OPINION.

TRAMMELL: Section 234 (a) (3) of the Revenue Acts of 1921, 1924, and 1926 provides that in computing the net income of a corporation there shall be allowed as a deduction taxes paid or accrued within the taxable year, except (a) income, war-profits and excess-profits taxes imposed by the authority of the United States, (b) so much of the income, war-profits and excess-profits taxes imposed by the authority of any foreign country or possession of the United States as is allowed as a credit under section 238, and (c) taxes assessed against local benefits of a kind tending to increase the value of the property assessed.

Section 238 (a) of said acts provides as follows:

In the case of a domestic corporation the tax imposed by this title shall be credited with the amount of any income, war-profits, and excess-profits taxes paid or accrued during the same taxable year to any foreign country, or to any possession of the United States: *Provided*, That the amount of such credit shall in no case exceed the same proportion of the tax (computed on the basis of the taxpayer's net income without the deduction of any income, war-profits, or excess-profits taxes imposed by any foreign country or possession of the United States), against which such credit is taken, which the taxpayer's net income (computed without the deduction of any such income, war-profits, or excess-profits tax) from sources without the United States bears to its entire net income (computed without such deductions) for the same taxable year. * * *

The first issue raised by the pleadings and set out in our preliminary statement involves the action of the respondent in allowing as deductions in computing net income, under section 234 (a) (3) of the statutes above quoted, instead of allowing as credits against the tax, under section 238 (a) of the same statutes the amounts of certain French and British income taxes accrued by the petitioners in the taxable years. The parties stipulated at the hearing that the amounts of such taxes were properly accrued as set forth in our findings of fact, above. Accordingly, the amounts so stipulated and found should, subject to the limiting provisions of section 238 (a),

*supra*, be allowed as credits against the tax in recomputing the deficiencies herein under Rule 50.

The second issue raises the question of the correctness of the respondent's action in allowing as deductions in computing net income, under section 234, instead of allowing as credits against the tax, under section 238, the amounts of certain French " turnover " taxes paid by the petitioner Moscow Fur Trading Co. in the taxable years. The amounts so paid were stipulated by the parties at the hearing, and are set out in our findings of fact, above. The parties agree also that if the said taxes are in fact in the nature of income or profits taxes, the petitioners are entitled to have said amounts applied as credits against the tax for each of the years here involved, instead of allowed as deductions in computing net income. The precise question presented for decision, therefore, is whether or not the French " turnover " tax is an income or profits tax.

The French law of June 25, 1920, instituting the tax here in controversy, designates it in article 59 as " a turnover tax." The phrase " turnover tax " at once suggests the idea of a tax based on the amount of the turnover or business transacted, or in other words, a tax computed upon the amount of the gross sales. That such is the meaning of the term as used in the French law is indicated by the language of article 59, as follows: " * * * a turnover tax is instituted on the amount of business done in France by persons who, habitually or otherwise, purchase for resale, or who accomplish such professional acts, which are subject to taxation on industrial and commercial profits * * *." The turnover tax, then, is in the first place instituted on the amount of business done in France by persons who purchase for resale, and is limited to professional acts which are subject to taxation on industrial and commercial profits, thus indicating that the turnover tax itself is not a profits tax.

That the turnover tax is a sales tax and not a tax on income or profits is further indicated by article 62, which provides that:

For the liquidation of the tax instituted by article 59, the turnover is established as follows:

(1) For persons selling merchandise, * * * by the amount of actual sales that are definitely realized.

(2) For intermediary persons: Proxies, designers, hirers of things, contractors, or hirers of services, bankers, discounters, changers, by the amount of the brokerage, commissions, remittances, salaries, rentals, interests, discounts, premiums and other profits definitely acquired.

While paragraph (2) of article 62 refers, among other things, to " salaries, rentals, interests, discounts, premiums and other profits," it seems clear that the intermediary persons mentioned are regarded as being in the business of selling services and it is on the basis of the gross sales of such services that the tax is determined. This is none

the less true because of the fact that gross sales of services may be equivalent to gross income or profits. The tax in effect is not laid upon but is merely measured by the amount of the gross sales. Such interpretation is supported by the further provisions of article 62, as follows:

If a person effects operations which partly belong to the first category (sales of merchandise) and partly to the second category (sales of services), the turnover is determined by applying to each of the operations the above definitions.

If taxes have been collected on *sales or services* which are subsequently cancelled, or which remain unpaid, they will be deducted in the manner fixed by the regulation of the Public Administration * * *. (Italics supplied.)

Article 63 provides that: " The rate of the tax is fixed at one per cent * * * of the turnover as defined in the preceding article." And since the " turnover " is defined in the preceding article 62 as the " amount of actual sales," either of merchandise or services, " definitely realized," the statute thus imposes a tax equal to one per cent of the actual or gross sales " definitely realized." Article 63 further provides that the tax of one per cent is increased to " Three per cent (3%) * * * on business done relating to lodgings," etc., and " To Ten per cent (10%) * * * on retail sales or consumption of merchandise, victuals, supplies, or any objects classed as being de luxe." (Italics supplied.)

Article 66 provides that:

Any person subject to the turnover tax, if he has not habitually a bookkeeping system showing the amount of turnover as defined in article 62 and the following ones, must have a book with numbered pages in which he enters day by day, without blanks or erasures:

(a) *If he sells merchandise,* groceries, supplies or objects, *each sale effected;*

(b) *If he sells services,* each amount of brokerage, commissions, remittances, salaries, rentals, interests, discounts, premiums, and other profits, constituting the remuneration for his services. (Italics supplied.)

We deem it unnecessary to make further detailed references to the provisions of the French law. The provisions above pointed out clearly establish, we think, that the law in question imposes an excise tax on the privilege of carrying on in France businesses of the kinds enumerated, which tax is measured by the amount of the gross sales " definitely realized." The tax essentially and fundamentally is an excise tax as distinguished from a tax laid upon income and profits. We find no provision in the French statute in question which we are able to construe as imposing a tax on income or profits, either gross or net.

In *Herbert Ide Keen,* 6 B. T. A. 275; *James R. Hatmaker,* 15 B. T. A. 1044; *Herbert Ide Keen,* 15 B. T. A. 1243; and *Hugh C. Wallace et al.,* 17 B. T. A. 406, we had before us the question whether the French law of July 15, 1914, imposed an income tax. In each of the

cases cited, we held that the tax imposed by the said law was in effect an income tax, notwithstanding the fact that, in the case of persons not domiciled in France, but who possessed one or more residences there, the tax was computed on the basis of a taxable income arbitrarily fixed at a sum equal to seven times the rental value of the residences. With respect to whether the tax so imposed was in its nature an income tax, we said in *Herbert Ide Keen*, 15 B. T. A. 1243, 1246, *supra:*

The statute imposing the French tax states that " The taxable income is fixed at a sum equal to seven times the rental value of this or these residences * * * ." Whatever may be the nature of the tax, it is imposed upon what the French Government determines to be income. It is in no sense of the word imposed upon the ownership of property. It is a part of a statute which imposes income taxes upon citizens and residents of France. In view of this situation, we think that the tax was an income tax * * *. The fact that under the law the taxable income is determined in a manner different from the taxable income under the Revenue Act of 1921 does not change the nature of the tax.

In the instant case a wholly different situation is presented. The law here involved is not part of a statute which imposes an income tax upon citizens and residents of France, or any one else. The tax is not laid upon income or profits, either actual or fictitious, nor is the determination of the amount of the tax in any wise dependent upon the amount of income derived or profits earned.

Having reached the conclusion that the tax here in question is not an income or profits tax, the action of the respondent on the second issue is approved.

The third issue brings into question the correctness of the respondent's action in disallowing deductions claimed by the petitioners for entertainment and traveling expenses of its officers on business trips to Europe. The petitioners maintained a number of buying and selling agencies in Europe and apparently transacted a large amount of business there. At any rate, the evidence shows that the business of the foreign branches required the principal executive officers to spend a considerable portion of their time in the countries where such branches were located. The president was in Europe on an average of five to seven months in each year. On such trips, the officers entertained customers, which is a recognized and common practice in the fur trade, and a necessity from a business standpoint.

Beginning prior to the taxable years, the petitioners adopted the plan of paying to its president and senior vice president $1,000 each per month, in addition to their salaries, to reimburse them for traveling and entertainment expenses on the European trips made in connection with the business affairs of the corporations. This practice was originally instituted by the said officers in conference with

the secretary, and while it was never formally authorized by the board of directors nor embodied in a formal contract, the arrangement has been continued down to the present time, extending over a period of approximately 10 years, without objection from any stockholder or director. After adoption of the lump-sum allowance plan, the officers paid their own expenses for travel and entertainment, making no charges for such items against the corporations, and they were not required to account for the money so spent.

There is nothing in the records before us to suggest that the amounts in question represent in any degree a distribution of profits under the guise of expenditures for expenses. Each officer received a salary of $36,000 per year until 1925, when the salary of each was increased to $48,000. The president owned from 30 to 60 per cent of the outstanding common stock, while the senior vice president held from 6 to 10 per cent. Yet each received the same allowance for entertainment and traveling expenses, and the amounts actually expended for such purposes exceeded the aggregate amount of the allowances.

We are of the opinion that the amounts paid by the petitioners to the president and senior vice president during the respective taxable years, under the circumstances here shown, constituted ordinary and necessary expenses paid or incurred during those years in carrying on the business of the petitioners, and are proper deductions in computing net income.

In *Hess Brothers*, 7 B. T. A. 729, 732, where we considered the same question under substantially similar facts, we allowed the deductions, saying:

> The fact that the president and vice president were not required to keep itemized expense accounts is not material, as the evidence shows that the sums were authorized by the petitioner; were expended by the officers in carrying on the business and were, in fact, less than the amounts actually expended by said officers. *Julius Forstmann*, 6 B. T. A. 21.

Apparently, the respondent disallowed the deductions here claimed because of lack of satisfactory proof as to the nature of the expenditures. Having so explained his position, counsel for the respondent stated at the hearing: " We frankly approach that question in anticipation of proof on the point." The evidence now presented in the record, we think, is sufficient to establish the deductibility of the amounts in controversy. On the third issue, the action of the respondent is reversed.

The fourth issue concerns the action of the respondent in disallowing a deduction claimed by the petitioners as a business expense in the amount of $25,750 representing a payment made in 1926 to the Charity Chest of the Fur Industry of the City of New York, under the circumstances set out in our findings of fact.

Individuals are permitted by the statute to deduct the amount of contributions or gifts made to religious, charitable, scientific, literary or educational organizations within certain limitations (sec. 214 (a) (10)), but such deductions concededly are not allowable in the case of corporations, nor is the deduction here in controversy claimed as such. However, corporations as well as individuals are permitted to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business (sec. 234 (a) (1)), and it is under this provision of the statute that the petitioners claim the deduction, contending that the amount was an ordinary and necessary expense paid or incurred in carrying on their business in the taxable year.

We have consistently adhered to the rule that a donation or contribution made by a corporation, of the kind here in controversy, is deductible as a business expense when, and only when, it bears some reasonable relation to the conduct of the corporation's business. *Poinsett Mills*, 1 B. T. A. 6; *Thomas Shoe Co.*, 1 B. T. A. 124; *Holt-Granite Mills Co.*, 1 B. T. A. 1246; *Oliver Finnie Co.*, 2 B. T. A. 134; *Anniston City Land Co.*, 2 B. T. A. 526; *Elm City Cotton Mills*, 5 B. T. A. 309; *Hibbard, Spencer, Bartlett & Co.*, 5 B. T. A. 464; *Superior Pocahontas Coal Co.*, 7 B. T. A. 380; *Indiana Harbor Belt Railroad Co.*, 16 B. T. A. 279.

In *Killian Co.*, 20 B. T. A. 80, 84, we said:

In our opinion, neither the deduction of an item by a corporation nor its disallowance depends upon whether it is a donation. The Board has frequently held that the deductibility of items such as this depends in each case upon the particular evidence to prove its relation to the proper conduct of petitioner's business. Items which may colloquially be called donations, because perhaps the recipient is a charity or the occasion is beneficent or the transaction is not approached in a formal manner with express legal consideration, may still have such a business significance as to justify their outlay and their recognition as business expenses. When by adequate evidence they are shown to be such, they are deductible as any other ordinary and necessary expense; and when the evidence fails to establish this or shows in fact that the donations are not reasonably motivated by or related to the proper conduct of the business, the deduction must fail.

There is no substantial disagreement respecting the correct rule of law, nor is there conflict of authorities. The difficulty arises in applying the rule to the facts of a given case in determining whether the donation bears such reasonable relation to the business of the corporation that it constitutes an allowable deduction as a business expense.

In *Poinsett Mills*, *supra*, the corporation made a contribution to a church maintained in its mill village, 90 per cent of the congregation of which was composed of employees of the corporation. We

held that the donation was made for purposes reasonably connected with the operation of the petitioner's business, that it represented a consideration for benefits flowing directly to the corporation, and was deductible as a business expense. See also *Superior Pocahontas Coal Co.*, *supra.*

In *Anniston City Land Co.*, *supra*, the corporation contributed $3,430 to a fund to be used to purchase a tract of land to be given to the Government for the establishment of an Army Post. The business success of the corporation depended upon the demand for lots and acreage which it was offering for sale. The establishment of the Army post stimulated such demand, and thus increased sales of the petitioners property, which in turn resulted in increased profits for the company. We held that the contribution had in a direct sense a reasonable relation to the petitioner's business and allowed the deduction as a business expense.

In *Corning Glass Works* v. *Lucas*, 37 Fed. (2d) 798, the question was whether a contribution of $25,000 to the building fund of a hospital, made by the corporation in part to avoid enlarging the dispensary facilities at its factory, was deductible as a business expense. The court held that the contribution was reasonably incidental to the carrying on of the company's business for the company's benefit, and therefore allowable as a deduction.

In *American Rolling Mills* v. *Commissioner*, 41 Fed. (2d) 314, the president of the petitioner corporation in the latter part of 1919 presented to the chamber of commerce of the city a plan to raise the sum of $1,000,000 for civic betterment. The underlying purposes of the plan were to make the city more desirable to live in and to encourage the employees of the petitioner to purchase homes. It was determined that $600,000 of the fund should be allocated to the industries of the city, and that each industry should contribute to the fund upon the basis of its invested capital, the number of employees, and the volume of sales. All of the industries of the city except two joined in the plan, and upon the basis indicated, $360,000 of the $600,000 was allocated to the petitioner. The question was whether the amount so contributed by the petitioner was deductible as a business expense.

The petitioner in that case employed about one-half of the wage-earning population of the city, and contributed 36 per cent of the total fund, which was to be distributed among the following beneficiaries: American Legion, board of education, Boy Scouts, city commission, community building, Girl Scouts, hospital, girls' club, public library, park commission, Road of Remembrance, recreation association, Y. M. C. A., contingent. With the exception of the amount distributed to the city commission, and that allocated to the contin-

gent fund, the court held that the contribution of the petitioner was deductible as a business expense. The court pointed out that the business of the petitioner had been successfully operated for twenty years under a policy looking to the contentment, and well-being of its employees, and that it was in pursuance of that policy that the petitioner determined to make the contribution in question. In its opinion, the court further observed:

> The question always is whether balancing the outlay against the benefits to be reasonably expected, the business interest of the taxpayer will be advanced. The answer must depend, among other things, upon the nature and size of the industry, its location, the number of its employees as compared to the entire community, the type of its employees, and what other employers similarly situated are doing. * * *
>
> We can not accept the contention that to permit the petitioner to make this contribution would give to a corporation the right to make donations which is given exclusively to individuals. * * * The contention overlooks the fact that the contribution was not a philanthropy, but was a business expenditure to be reflected in increased earnings. The right to make such expenditures is not confined to corporations, but is also given to individuals. The individual has the additional right, under the statutes, to make gifts to charity that have no relation to business expenses.

From the foregoing decisions, it appears that a correct application of the rule requires that the deduction be allowed where the evidence shows that the contribution was not a matter of charity or philanthropy, but was made as a necessary incident to the business.

The instant case, in our opinion, does not come within the rule. The relation of the payments to the proper conduct of the petitioner's business was too remote and incidental. The fund to which the contribution was made was to be distributed among various charities, including the Fur Foundation. The evidence does not disclose what proportion of the contribution went to that organization, or what ratio the number of petitioner's employees has to the total number which might possibly be beneficiaries of that foundation. There does not appear any direct benefit, so far as the petitioner is concerned, from the contribution. The petitioner's employees were entitled to benefits through the Fur Foundation in case of sickness or for other reasons, but other charities gave assistance to people generally and apparently would not exclude employees of the fur industry merely because they were or had been such.

In the *American Rolling Mill Co.* case and the *Corning Glass* case the employees of the taxpayers there involved contributed a substantial proportion of the total number of persons who were direct beneficiaries and the so-called contributions in those cases were very substantially and directly for the benefit of the corporations themselves, but here the petitioner's place of business was in New York, where the number of employees of the petitioner was inconsequential

in comparison to the population or number of people to be benefited. The petitioner's employees were benefited so slightly and the corporation so indirectly and remotely that we do not think the situation comes within the principle of the *American Rolling Mills* case and other cases cited. Nor do we think that the situation here presented comes within the principle of the *Anniston City Land Co.* case, *supra*, where the contribution was made with the reasonable expectation of increasing sales and profits. It may well be true that the contribution was made for the purpose of maintaining good will on the part of purchasers, but this may well be true in the case of many unquestioned contributions to charity. It may also be true that the failure to make the contributions would have been bad business on the part of the petitioner, but this might be said in connection with other contributions to charities. The failure to make a contribution to a needed charity when competitors make such contributions might arouse some criticism on the part of a portion of the public or even some customers, but we do not think that this fact changes a charitable contribution into a business expense. We must keep in mind the fact that the statute does not authorize a deduction of such a contribution by a corporation. Doubtless Congress had a purpose in denying such deductions on the part of corporations while allowing them when the contribution is made by an individual. The fact that some pressure is brought to bear upon corporations to make charitable gifts is not, in our opinion, enough to change their character to business expenses.

We do not think, under the circumstances, that the contribution in question was so incidental to or connected with the carrying on of the petitioner's business as to be considered an ordinary and necessary business expense. The action of the respondent on this issue is affirmed.

The fifth issue raises the question whether the respondent erred in disallowing the deduction claimed as a business expense of the amount of $37,500 paid in the fiscal year 1926 by the petitioner's subsidiary, the United Fur Exchange, Inc., to Albert M. Ahern in consideration of his refraining from entering into competition with said subsidiary in certain restricted territory and for a specified period of time.

By written contract dated July 23, 1923, the subsidiary purchased from Ahern the stock of certain corporations owned or controlled by him, for the sum of $403,484.42. By entirely separate and distinct provisions of the contract, unrelated to the sale and purchase of the stock of the corporations, Ahern agreed that he would not directly or indirectly engage or be interested in or connected with any firm, person or corporation which might engage, in any part of North

America in the " fur receiving business," or in St. Louis, Mo., in the " fur auction business," within a period of ten years beginning with the date of the contract and ending July 23, 1933. In consideration of Ahern's covenant not to compete, the subsidiary agreed " to cause to be paid to Mississippi Valley Trust Co. of St. Louis for you (Ahern) or your legal representatives (but if your wife Eulalie F. Ahern survive you, then for her or her legal representatives, but she shall also have the power of disposition by will of any unpaid installments), the sum of $375,000, of which $18,750 shall be payable on the 3rd day of January, 1924, $18,750 on the 3rd day of July, 1924, $18,750 on the 3rd day of January, 1925, $18,750 on the 3rd day of July, 1925, and $37,500 on the 3rd day of July of each year from 1926 to 1933, both inclusive."

During the year 1926 the petitioner's subsidiary paid to Ahern the sum of $37,500 pursuant to the terms of said contract, and this amount was claimed as a deduction from income in the consolidated return filed by the petitioners for said year. The deduction so claimed was disallowed by the respondent on the theory that the payments to Ahern constituted expenditures " strictly of a capital nature, the benefit derived being a business untrammelled and free from interference by Ahern's good will or competing activities in the trade."

In support of his position, the respondent cites *John C. Moore Corporation*, 3 B. T. A. 430; *Market Supply Co.*, 3 B. T. A. 841; *Newark Milk & Cream Co.*, 10 B. T. A. 683; *Laemele* v. *Eisner*, 275 Fed. 504. The decisions cited are not in point, and on the facts are readily distinguishable from these proceedings. Only the case of *Market Supply Co.*, involved a contract to refrain from entering into competition, and the deduction in that instance was disallowed for lack of proof of the amount paid as consideration for such covenant.

We can not agree with the respondent's contention that the payments to Ahern represent part of the cost of the businesses acquired by the petitioner through the purchase of the stock of the corporations. The petitioner, through its subsidiary, paid a definitely stated amount for the stock, and agreed to pay in addition a definitely specified consideration for Ahern's covenant not to enter into competition. The fact that provisions constituting in effect two separate contracts were embodied in one written instrument is not material. The provisions of the contract are clear on this point, and specifically indicate that the consideration paid for the stock was " entirely distinct " from the consideration paid for the covenant.

In *Farmers Feed Co. of New York*, 17 B. T. A. 507, 552, the petitioner acquired or entered into several contracts with corporations and individuals for the purchase of assets, including good will and

covenants not to engage in a competing business in specified territory and for a specified time. The question was whether the respondent erred in failing to make a reasonable allowance for the exhaustion of the contracts, based upon the cost to the petitioner of said covenants. In our opinion, we said:

The record shows very clearly that the motivating cause for the acquisition of all of the contracts hereinbefore discussed, either by the petitioner or its predecessor, was not to acquire additional tangible assets or to broaden the field of its manufacturing activities, but to stifle and render impossible the recurrence of competition in the manufacture of feed from brewers' grain, and it shows further that, notwithstanding that the amounts paid as consideration for those various contracts were written off to profit and loss, the values remained the same as when they were entered into. That they were of immense value to the petitioner can not be doubted. * * *

* * * The petitioner's business was protected by the various contracts and agreements which it entered into for the periods of years specified therein. As each year passed the protection afforded by those contracts was diminished, and as the expiring date drew nearer the value became less because then, and only then, could the covenantors to the contracts proceed safely into the field of competition with the petitioner again. * * * These contracts are made for specified periods of time and we can attach no value to them beyond the period so specified and we, therefore, see no reason why they should not be exhausted in the normally accepted manner.

The foregoing case differs from the facts here in that the consideration for each covenant was paid in a lump sum when the contract was entered into or acquired.

In *Black River Sand Corporation*, 18 B. T. A. 490, 498, after holding that the respondent erred in disallowing a deduction of the amount paid for certain services rendered, we said:

Nor do we see any reason why the deduction of the amount paid Gallup for his covenant to refrain from competition should not be allowed. * * * We have held in *Farmers Feed Co.*, 17 B. T. A. 507, that the taxpayer there was entitled to amortize the cost of contracts similar to the one here. In that case the cost was paid upon the acquisition of the contracts. In this proceeding payment was made ratably over the life of the contract and, therefore, the annual payment equals the amount of yearly exhaustion on the cost of the contract.

In the instant case, the petitioner's subsidiary acquired valuable rights under its contract with Ahern, at a total cost of $375,000, payable at the rate of $37,500 annually for the period of ten years. The contract has a life of ten years, upon the expiration of which its value will be exhausted. Hence its value was and is being exhausted ratably by the passage of time. The provisions of the contract relating to the payment to other persons of any remaining installments in the event of Ahern's death prior to 1933, we think, are immaterial. This in no wise affects the total cost of the contract to the petitioner, which is the basis for computing the exhaustion

allowance. A somewhat similar situation existed in the *Black River Sand Corporation* case, *supra*. But if the payment of the amount be held to be an ordinary and necessary expense instead of a capital expenditure to be amortized, the same result would be reached, the same amount would be allowable as a deduction in each year. In our opinion, the respondent erred in disallowing the deduction claimed, and his action on the fifth issue is, therefore, reversed.

Issue six was abandoned and no evidence offered in respect thereto. Accordingly, the action of the respondent on this issue is affirmed.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

MURDOCK concurs in the result only.