**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIA-TION, a National Banking Association**

v.

**The UNITED STATES.**

Nos. 184–68, 138–69.

United States Court of Claims.

May 12, 1972.

**514**

Harry R. Horrow, San Francisco, Cal., Attorney of Record, for plaintiff; Stephen J. Martin, David L. Klott, and Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel.

Michael H. Singer, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## OPINION

DAVIS, Judge.*

For a domestic corporation, § 901(a) and (b) (1) of the Internal Revenue Code of 1954 allows a credit against federal income taxes of "the amount of any income, war profits and excess prof-

its taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States * * *."[1] Bank of America National Trust and Savings Association, organized under the laws of the United States with its principal office at San Francisco, seeks judgment in these consolidated cases for refund of income tax for its taxable years 1959, 1960, and 1961. It challenges the determination of the Internal Revenue Service that certain foreign taxes paid for these periods were not "income taxes" within § 901(b) (1), and hence not to be treated as foreign tax credits against plaintiff's income tax liability pursuant to § 901(a). No. 184–68 covers 1959 and 1960, while No. 138–69 concerns 1961. The foreign taxes involved were paid, for all three years, to the Kingdom of Thailand and the Republic of the Philippines, and also to the Philippines for 1958.[2] For 1961, taxes were also paid to the Republic of Argentina.

In each of these countries, plaintiff conducted a general banking business from a branch office. These were located at Bangkok, Thailand; Manila in the Philippines; and Buenos Aires, Argentina. In each nation, this business included, but was not limited to, the making of commercial, real estate and personal installment loans, the rendering of trust department and property management services, foreign exchange

---

\* We are grateful for the opinion of Trial Commissioner Roald A. Hogenson, from which we have borrowed, though we reach a different result on the issues contested before the judges (Parts II, III, and IV, *infra*).

1. Section 901 provides insofar as relevant:

"(a) *Allowance of credit.*—If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the applicable limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) * * *

"(b) *Amount allowed.*—Subject to the applicable limitation of section 904, the following amounts shall be allowed as the credit under subsection (a) :

(1) *Citizens and domestic corporations.*—In the case of a citizen of the

United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; * * * *"
[68 Stat. 285 (1954), as amended by section 3(a), Act of September 14, 1960, P.L. 86–780, 74 Stat. 1010, 1013 (1960). Section 3(a) of the Act of September 14, 1960, amended subsections (a) and (b) of section 901 by striking out "the limitation of section 904." 74 Stat. at 1013. Section 4 of that Act provided that the amendment applied with respect to taxable years beginning after December 31, 1960. *Ibid.*]

2. 1958 is involved only because of a Philippines tax credit carry-over from that year to 1959.

transactions, the issuance of letters of credit, guarantees, travelers checks and cashiers' checks, and acceptance of trade paper.

With respect to this banking business, Bank of America paid the three jurisdictions various types of taxes. The findings detail the names of those imposts and the amounts paid. It is enough to say here that in each country plaintiff paid the general income tax imposed on corporations operating there.[3] In addition, taxpayer paid other tolls.

Demand for credit under § 901 of most of these assessments was made either on the federal income tax returns or by refund claim.[4] After consideration, the Revenue Service allowed (except for a small inadvertent error which the parties have corrected by stipulation) the following of the foreign taxes as credits against plaintiff's federal income tax liabilities for the taxable years: Thailand Companies Income Tax and Profit Remittance Tax, Philippines Tax on Foreign Corporations, and Argentina Corporation Income Tax and Excess Profits Tax. This treatment is not disputed. In addition, the parties have agreed that the Philippines Residence Tax was not creditable but was properly allowed as a deduction under § 164.

When the case was submitted to the trial commissioner, the following taxes remained in dispute:

Kingdom of Thailand: Business Tax, Type 1 and Type 2, Municipal Tax, and Receipts Tax.

Republic of the Philippines: Tax on Banks.

Republic of Argentina: Tax in Substitution of Surcharge on Free Transfer of Property, City of Buenos Aires Tax on Profit-Making Activities, and

Contribution to the Bankers' Institute for Social Services.

The trial commissioner denied taxpayer the right to recover with respect to the Thailand Municipal Tax, the Thailand Receipts Tax, the Argentina Tax in Substitution of Surcharge on Free Transfer of Property, and the Argentina Contribution to the Bankers' Institute for Social Services. Plaintiff has not sought review of those rulings and thereby acquiesces in them. We agree with the trial commissioner's discussion on that aspect of the case, and in Part I of this opinion, *infra*, adopt it (with slight modifications) as our own.

The trial commissioner held, however, for plaintiff on the other taxes: the Thailand Business Tax, Type 1 and Type 2; the Philippine Tax of Banks; and the City of Buenos Aires Tax on Profit-Making Activities. We disagree with that position and in Parts II, III, and IV, *infra*, give our reasons for holding against plaintiff on those levies.

### I.

With respect to the four foreign taxes (two imposed by Thailand and two by Argentina) which Trial Commissioner Hogenson believed not to be creditable under § 901, we concur that the Bank of America has failed to meet its burden of proof or persuasion[5] that any of those assessments is an "income tax" accrued and payable to a foreign country. It is now settled that the question of whether a foreign tax is an "income tax" within § 901(b) (1) must be decided under criteria established by our revenue laws and court decisions, and that the foreign tax must be the substantial equivalent of an income tax as the term is understood in the United States. Missouri Pacific R. R. v. United

---

3. In Thailand this was the Companies Income Tax; in the Philippines, the Tax on Foreign Corporations; in Argentina, the Corporation Income Tax.

4. Plaintiff uses the accrual method and is on the calendar year basis.

5. Rule 125 of this court provides that the determination of foreign law shall be

treated as a ruling on a question of law, but the court or trial commissioner, in determining foreign law, may consider any relevant material or source including testimony, whether or not submitted by a party or admissible under Rule 133, the reception of evidence rule.

States, 392 F.2d 592, 597, 183 Ct.Cl. 168, 175 (1968); Allstate Ins. Co. v. United States, 419 F.2d 409, 413–414, 190 Ct.Cl. 19, 27 (1969).

■ On the Thailand Municipal Tax and the Thailand Receipts Tax, plaintiff cites no provisions of the translated portions of The Revenue Code of Thailand attached to the stipulation of facts, nor are any provisions found there, which seem to pertain to those laws. There is no other testimony or evidence concerning the nature of the taxes. Taxpayer's position is that those taxes present no independent legal issues since allegedly each is calculated as a flat percentage of plaintiff's annual liability for the Thailand Business Tax, citing Rev.Rul. 70–21, 1970–1 Cum.Bull. 158, for the proposition that, in that situation, the creditability of the dependent foreign tax depends upon the creditability of the principal tax. In response to defendant's correct assertion that no evidence was adduced as to the nature of those taxes, nor as to the nature of plaintiff's liability for such taxes, plaintiff's reply was that the determination of foreign law is a question of law as to which the court and the trial commissioner may consider relevant materials from any source. Efforts by the trial commissioner to obtain a reliable and authoritative translation of such laws proved unsuccessful. Rule 125 cannot reasonably be interpreted to shift the burden onto the court or the trial commissioner to search for documentation necessary for determination of a question of foreign law, particularly in the circumstances where the litigant before the court conducts a business in the foreign country, subject to its laws.

■ On the Argentina Tax in Substitution of Surcharge on Free Transfer of Property, it is sufficient to observe that that tax is levied upon a corporate taxpayer annually at the rate of 1 percent of its capital and reserves. Plaintiff has wholly failed to show how or in what respect the tax was imposed upon its Argentina income in 1961. Plain-tiff's distress is expressed by the statement in its opening brief to the trial commissioner that it was unsuccessful in obtaining from its Argentine office the details of the computation of the allegedly creditable and noncreditable portions of the tax.

■ The Argentina Contribution to the Bankers' Institute for Social Services is obviously a social security revenue measure. The Bankers' Institute, an instrumentality of the government of Argentina, administers a social security program within the banking industry. The revenue is basically derived from compulsory contributions of employees and employers within the banking industry, with the respective contributions being 2 percent of monthly salaries received and paid. By amendment effective March 7, 1957, each bank was required to pay contributions equal to 2 percent of the total amounts received by it in respect of interest and commissions. The proof with respect to the amendment is fragmentary, and plaintiff's position cannot be sustained that the 1957 amendment repealed the previous provisions imposing contributions upon the employer to match the required contributions of employees. In any event, the tax of 2 percent of amounts received by a bank by way of interest and commissions, which tax was in whole or in part the compulsory contributions of the bank to funds otherwise contributed by the bank's employees to sustain a government social security program for bank employees, cannot be equated to an income tax under United States concepts.

## II.

There is greater difficulty in disposing of the three taxes the trial commissioner held creditable: the Thailand Business Tax, Type 1 and Type 2; the Philippines Tax on Banks; the Buenos Aires Tax on Profit-Making Activities.

A. From the unchallenged findings and the presentations of the parties, we are justified in assuming that these were all in substance levies on the tax-

payer's gross income from its banking business carried on by its branch in the particular country. Plaintiff has not proved otherwise or offered to prove otherwise. Defendant now accepts that description of the tax.

Section 78 of the Thailand Business Tax defines persons engaged in business as those listed in the Business Tax Rate Schedule of The Revenue Code of Thailand, and states that such persons have the duty to pay business tax on the "gross takings" for each tax month at the rates provided in the schedule. Section 79 defines "gross takings" from the business of banking as (a) interest, discounts, fees or service charges, and (b) profit, before the deduction of any expense, from the exchange, purchase or sale of currency, issuance, purchase or sale of notes or foreign remittances.

As to the category of business designated as "banking," the Business Tax Rate Schedule describes such business as savings banks other than that of the government, commercial banking under the law on commercial banking or the business of those who regularly do business similar to that of a commercial bank such as lending money, giving guarantees, currency exchange, issuance, purchase or sales of notes, foreign remittance by various means.

The Business Tax Rate Schedule imposes taxes of two designated types described as follows:

Type 1 Interest, discounts, fees or service charges.

Type 2 Profit before the deduction of any expenditure from the exchange, purchase or sale of currency, issuance, purchase or sale of notes or foreign remittances.

For Type 1 of the Business Tax on banking, the designated rate of tax is 2.5 percent of gross takings, and for Type 2, 10.5 percent of gross takings. Obviously, the tax is imposed upon a broad spectrum of the business activities of a bank.

The City of Buenos Aires Tax on Profit-Making Activities, in Article 115, imposes a tax on the gross receipts of banks, insurance, savings and loan and security and investment companies, and in Article 121 provides that, in the case of banks and other lending institutions, "the taxable amount shall be composed of interest, discounts, profits from non-exempt taxable securities and other revenue, resulting from profits and remuneration for services received in the course of the last business year."

The Philippines Tax on Banks provides in § 249 that there shall be collected a tax of 5 percent on the gross receipts derived by all banks doing business in the Philippines from interest, discounts, dividends, commissions, profits from exchange, royalties, rentals of property, real and personal, and all other items treated as gross income under § 29 of the National Revenue Code. Section 29 defines "gross income" as gains, profits, and income derived from any source whatever.

For none of the three taxes was the taxpayer permitted to deduct from gross income the costs or expenses of its banking business or of producing its net income.

B. The problem, then, is whether such imposts on gross banking income, of this character, are "income taxes" under the foreign tax credit (§ 901(b)(1))—"income taxes" as we use that term in the federal system under our own revenue laws. (The bank does not contend that it is entitled to credit for these taxes, under § 903, as taxes "paid in lieu of a tax, on income, war profits, or excess profits otherwise generally imposed by any foreign country.")

██ There is consensus on certain basic principles, in addition to the rule that the United States notion of income taxes furnishes the controlling guide. All are agreed that an income tax is a direct tax on gain or profits, and that gain is a necessary ingredient of income. See Stratton's Independence, Ltd. v. Howbert, 231 U.S. 399, 415, 34 S.Ct. 136, 58 L.Ed. 285 (1913); Brushaber v. Union Pacific R. R., 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493 (1916); Eisner v. Ma-

comber, 252 U.S. 189, 207, 40 S.Ct. 189, 64 L.Ed. 521 (1920); Keasbey & Mattison Co. v. Rothensies, 133 F.2d 894, 897 (C.A.3), cert. denied, 320 U.S. 739, 64 S.Ct. 39, 88 L.Ed. 438 (1943). Income, including gross income, must be distinguished from gross receipts which can cover returns of capital. Doyle v. Mitchell Bros. Co., 247 U.S. 179, 185, 38 S.Ct. 467, 62 L.Ed. 1054 (1918); Allstate Ins. Co. v. United States, 419 F.2d 409, 414, 190 Ct.Cl. 19, 27 (1969); 1 Mertens, Law of Federal Income Taxation, § 5.10 at 35–36 (1969). Only an "income tax", not a tax which is truly on gross receipts, is creditable.

We can also put aside as irrelevant to this case the frequent controversy whether the foreign tax is a direct income tax or a privilege, excise, or similar tax which happens to be measured by income.[6] The Thailand, Philippine, and Argentine bank taxes, whether or not they were "income taxes" for foreign tax credit purposes, were admittedly direct levies and not franchise, privilege, or excise taxes. But they were not imposed upon and limited to net gain.

The trial commissioner and the taxpayer say that this kind of direct gross income tax is nevertheless allowable under § 901(b) (1) because, in their view, gross income taxation (apparently any type of gross income tax) falls under the United States concept of an income tax. They emphasize that the Supreme Court has suggested that the Sixteenth Amendment extends the federal taxing power to gross income (New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934); Deputy v. du Pont, 308 U.S. 488, 493, 60 S.Ct.

363, 84 L.Ed. 416 (1940)); [7] that several federal taxing provisions are levied on gross income; that prior court decisions under the foreign tax credit have permitted use of certain foreign gross income assessments; and that Internal Revenue Service rulings have upheld the crediting of some foreign taxes levied on gross income. The generalization the plaintiff and the trial commissioner draw is that all gross income taxes (as distinguished from gross receipts levies) come within § 901(b).

For the reasons elaborated in this and the succeeding sections of this opinion, we cannot accept the position that all foreign gross income taxes, no matter whether or not they tax or seek to tax profit or net gain, are covered by that provision. True, the Supreme Court has indicated, somewhat cursorily, that Congress may impose gross income taxes, but the full ramifications of that observation are as yet unknown since Congress has not yet sought in its income tax legislation to disregard net gain entirely. On the contrary, from 1913 on, Congress has always directed the domestic levy at some net gain or profit, and for almost 60 years the concept that the income tax seeks out net gain has been inherent in our system of taxation. That is the "well-understood meaning to be derived from an examination of the [United States] statutes which provide for the laying and collection of income taxes"—the basic test set forth in Biddle v. Commissioner of Internal Revenue, 302 U.S. 573, 579, 58 S.Ct. 379, 381, 82 L.Ed. 431 (1938), for determining whether a foreign tax is an "income tax" under the foreign tax credit.

---

6. See, e. g., Keasbey & Mattison Co. v. Rothensies, 133 F.2d 894, 897, 898 (C.A. 3, 1943), supra; New York & Honduras Rosario Min. Co. v. Commissioner of Internal Revenue, 168 F.2d 745 (C.A.2, 1948); Commissioner of Internal Revenue v. American Metal Co., 221 F.2d 134, 137–140 (C.A.2), cert. denied, 350 U.S. 829, 76 S.Ct. 61, 100 L.Ed. 740 (1955); Eitingon-Schild Co. v. Commissioner of Internal Revenue, 21 B.T.A. 1163 (1931); Mallouk v. Commissioner

of Internal Revenue, 34 B.T.A. 269 (1936).

7. This was the statement in the *New Colonial Ice Company* case: "The power to tax income like that of the new corporation [the taxpayer there] is plain and extends to the gross income. Whether and to what extent deductions shall be allowed depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed."

Similarly, it comports better with the dominant purpose of the credit to avoid or minimize double taxation of income (Burnet v. Chicago Portrait Co., 285 U.S. 1, 7, 52 S.Ct. 275, 76 L.Ed. 587 (1932); Hubbard v. United States, 17 F. Supp. 93, 96, 84 Ct.Cl. 205, 212–213 (1936), cert. denied, 300 U.S. 666, 81 L.Ed. 873 (1937); Commissioner of Internal Revenue v. American Metal Co., 221 F.2d 134, 137 (C.A.2), cert. denied, 350 U.S. 829, 76 S.Ct. 61, 100 L.Ed. 740 (1955)) to refer to the actual system historically utilized by Congress in imposing domestic income taxes rather than to some potential and unused, though constitutionally permissible, scheme of gross income taxation. Where the gross income levy may not, and is not intended to, reach profit (net gain), allowance of the credit would serve only haphazardly to avoid double taxation of net income, since only the United States tax—under the concept followed since 1913—would necessarily fall upon such net gain. There would not then be any significant measure of commensurability between the two imposts (except by chance).[8] See, also, Owens, The Foreign Tax Credit (1961) 85, 86.

We do not, however, consider it all-decisive whether the foreign income tax is labeled a gross income or a net income tax, or whether it specifically allows the deduction or exclusion of the costs or expenses of realizing the profit. The important thing is whether the other country is attempting to reach some net gain, not the form in which it shapes the income tax or the name it gives. In certain situations a levy can in reality be directed at net gain even though it is imposed squarely on gross income. That would be the case if it were clear that the costs, expenses, or losses incurred in making the gain would, in all probability, always (or almost so) be the lesser part of the gross income. In that situation there would always (or almost so) be some net gain remaining, and the assessment would fall ultimately upon that profit.

For instance, it is almost universally true that a wage or salary employee does not spend more on expenses incident to his job than he earns in pay. A foreign tax upon the gross income of an employee from his work should therefore be creditable by the employee under § 901(b) (1) despite the refusal of the other jurisdiction to permit deduction of job-related expenses. The reason is, of course, that in those circumstances the employee would always (or almost always) have some net gain and, accordingly, the tax, though on gross income, would be designed to pinch net gain in the end—and would in fact have that effect. In those circumstances, a loss (excess of expenses over profit) is so improbable, and some net gain is so sure, that the tax can be placed on gross income without any real fear or expectation that there will be no net gain or profit to tax.[9]

### III.

This has been the underlying theory, as we see it, of the decisions, rulings, and legislation which both parties invoke. Sometimes the phrasing of the opinions and rulings has been overly broad or too narrow, but in each instance the core of the holding harmonizes with the principle that a direct income tax is creditable, even though imposed on gross income, if it is very highly likely, or was reasonably intended, always to reach some net

8. In seeking to reduce double taxation, Congress has not required that the foreign income tax be levied at the same rate as the United States income tax. The limitation on the credit established by § 904 of the Code can serve to prevent, to a certain degree, the off-setting of the foreign tax where there is no parallel income subject to domestic tax. But if foreign gross income levies were automaticaly creditable there would still be very many situations in which the § 904 limitation would permit a credit despite the absence of any comparable taxable income under our income tax law.

9. The Revenue Service has held foreign taxes measured by remuneration received by employees to be creditable. Owens, The Foreign Tax Credit (1961) 47. See also note 18, *infra*.

gain in the normal circumstances in which it applies—otherwise the gross income tax is not creditable.

*Decisions*: This was plainly so with the two court decisions on which taxpayer mainly rests: Seatrain Lines, Inc. v. Commissioner of Internal Revenue, 46 B.T.A. 1076 (1942), and Santa Eulalia Mining Co. v. Commissioner of Internal Revenue, 2 T.C. 241 (1943). The former held creditable a Cuban tax of 3 percent of the American company's gross income from its transportation business in Cuba. But the Board of Tax Appeals carefully pointed out (46 B.T.A. at 1080–1081) that originally Cuba levied a 6 percent tax on net profits and "the 3 percent by which the original 6 percent rate was reduced was apparently an approximation of the deductions allowed in arriving at net income and was adopted as a compromise measure in order to avoid the complex and vexatious allocation and calculation of the deductible items peculiar to the petitioner's business. Therefore, it appears that as to petitioner's business the present 3 percent tax is but the successor of the 6 percent income tax, took its place in the tax structure of Cuba, and preserved its character as an income tax." Commissioner of Internal Revenue v. American Metal Co., 221 F.2d 134, 140 (C.A.2, 1955), *supra*, referred to this *Seatrain* Cuban impost as a "formulary" income tax—a gross income tax which embodies within itself (via the rate or otherwise) consideration of the taxpayer's relevant costs and expenses.[10]

*Santa Eulalia* allowed the credit for a Mexican gross income tax on mining royalties, but the taxpayer did not operate the mine, retaining only the royalty right under its contract with the operator,[11] and it seems very clear that no costs or expenses *of the taxpayer* in obtaining the royalties were likely to outbalance those gains; the taxpayer itself would not suffer a deficit on the royalty transaction even if the mining operations went badly, whatever might be true of the operator.

Conversely, the decisions cited by the defendant, all denying the credit, are consistent with the allowance of the credit for a gross income tax where that tax is sure or highly likely to reach some net gain. Keasbey & Mattison Co. v. Rothensies, *supra*, 133 F.2d 894—aside from the point that the issue on which it turned was whether the Quebec mining tax was a privilege or an income tax, see note 6, *supra*—involved a mining business which obviously could either have lost or made money in any particular year. In that context, it was significant that "the expenses incident to the general conduct of the business, as distinguished from the costs incurred in the mining operation, are not deductible" (133 F.2d at 898); those non-deductible expenses could easily have made the difference between a net profit and a loss. For that business it could not possibly have been said that the tax would always, or almost always, reach some net gain.

Commissioner of Internal Revenue v. American Metal Co., *supra*, 221 F.2d 134, held squarely that the foreign tax was a levy on the privilege of mining which became due irrespective of the realization of cash proceeds and "even if the individual miner makes no profits—even if, having severed the ore, he makes no sales." 221 F.2d at 138, 139; see note 6, *supra*. There, too, mining was involved, with its recognized hazard of gain or deficit, and nothing substantial appears in the opinion to suggest that all gross income taxes were automatically excluded from the credit, no matter what their impact or what kind of income-producing activity was implicated. On the other hand, the theme of the court's discussion does run directly counter to plaintiff's latitudinarian insistence that

---

10. Other examples of "formulary" net income taxes are noted in Owens, The Foreign Tax Credit (1961) 44–46.

11. In computing the royalty, the operator deducted certain expenses, including a production tax paid to Mexico.

all gross income taxes are covered by § 901.[12]

Our own decision in Allstate Ins. Co. v. United States, 419 F.2d 409, 190 Ct.Cl. 19 (1969), likewise concerned a business in which a loss was quite possible, and the opinion was naturally directed to a gross income or gross receipts tax imposed in that type of industry. As the court said, that company "may have had a gain or it may have a loss in operating its insurance business during the year in question, but this would not affect the premiums tax it had to pay. This tax would have accrued and plaintiff would have been liable for it even if its business which produced the premiums had been operated at a loss", 419 F.2d at 414, 190 Ct.Cl. at 28.

The opinion also noted that "It is clear that if a tax is to qualify as an income tax within the meaning of Section 901 of the Code, it must have some relation to the gain, profit or loss of the taxpayer. It is not enough if it is merely a tax on income, such as an excise, sales, or gross receipts tax, without regard to these other factors." 419 F.2d at 415, 190 Ct.Cl. at 29. The *Allstate* decision thus plainly rejects the view that every foreign tax on gross income is creditable, even where net gain is not in fact taxed. But the opinion did not hold or say that a gross income tax which does (and is highly likely to) reach some net gain is also outside of § 901.

While the defendant would push *Allstate* into an exclusion of all gross income taxes *per se*, the trial commissioner and the plaintiff seek to distinguish *Allstate*, equally incorrectly, on a very special ground. That case dealt with a Canadian

tax on the gross premiums collected in Canada by an Illinois stock casualty insurance concern. The suggestion is that the decision turned on the *sui generis* taxation of insurance companies in this country, which excludes "unearned premiums" from taxable income (§ 832 of the Internal Revenue Code; Treas.Reg. § 1.801–3(e)).[13] The simple answer is that the opinion and decision were not rested on that narrow basis but on more general principles which are correct and applicable to the present case. There is no reason to repudiate that reasoning by putting *Allstate* on a different ground which the court did not choose or consider when the case was decided.

The few Tax Court rulings on which the Government calls also fit with the principle that the key is the effect of the foreign tax on net gain not simply whether the tax is in form on gross or net income. Eitingon-Schild Co. v. Commissioner of Internal Revenue, 21 B.T.A. 1163 (1931), characterized the French turnover tax as "an excise tax on the privilege of carrying on in France businesses of the kinds enumerated" (21 B.T.A. at 1174), measured by gross sales or gross receipts (see note 6, *supra*), and concluded: "The tax is not laid upon income or profits, either actual or fictitious, nor is the determination of the amount of the tax in any wise dependent upon the amount of income derived or profits earned" (21 B.T.A. at 1175). This position is neither a rejection nor an acceptance of all gross income taxes.

The recent opinion in F. W. Woolworth Co. v. Commissioner of Internal Revenue, 54 T.C. 1233, 1260–1261 (1970), did no more than hold (so far as now pertinent)

---

12. Defendant also cites United States v. Waterman S.S., 330 F.2d 128 (C.A.5, 1964), aff'd on other issues, 381 U.S. 252, 85 S.Ct. 1389, 14 L.Ed.2d 370 (1965), but that decision is wholly inapposite since it involved only the "in lieu" provision of § 903 and a foreign privilege tax which the court held had not been shown to have been levied in lieu of an otherwise generally imposed income or profits tax. No issue was presented as to § 901(b) (1).

13. As the trial commissioner put it in his opinion below: "In light of the statutory scheme represented by section 822 for determining the gross income of certain insurance companies, it is clear that the Canadian tax on the gross amount of premiums collected which failed to take such items as unearned premiums into account was a tax on gross receipts as distinguished from a direct tax on income within our concepts."

that a British tax on the rental value of property was not an "income tax" within our concept because it attributed that income "notionally" to an owner who never rented the property but occupied it himself. In saying that our concept of "income" is "based upon gain or profit realized by the taxpayer (*i. e.*, net income as opposed to gross income, gross sales, or some other basis)", the court obviously meant only that net gain is at the heart of our idea of the income tax. It did not mean to overrule the principle of *Seatrain* and *Santa Eulalia, supra,* crediting gross income taxes where it was clear that taxpayers subject to the tax would regularly have net gain and the gross income tax would therefore reach a residue of net income.

*Rulings*: Plaintiff insists that a number of Revenue Service pronouncements support its position that gross income taxes, as a general class, fall under § 901 (b) (1), but we understand these rulings as showing—like the court decisions we have just discussed—no more than that such levies are creditable if they plainly put the bite on some net income or profit.

I.T. 2620, 11–1 Cum.Bull. 44 (1932),[14] and I.T. 3385, 1940–1 Cum.Bull. 103, credited a Mexican tax on receipts in the form of interest or rents, which was deducted and withheld at the source. Though these summary rulings do not detail their reasoning, we believe the Service must have assumed that such interest and rents, taxed at the source, are rarely, if ever, wholly offset by the taxpayer's costs or expenses of obtaining that type of income. See Missouri Pacific R. R. v. United States, *supra,* 392 F.2d at 598, 183 Ct.Cl. at 176: " * * * these rulings seem to place in a special category income from interest and rents,

as if this type of increment from capital represents a classical flow of 'income' which requires no deductions."

In the same fashion, I.T. 4013, 1950–1 Cum.Bull. 65, dealing with a Brazilian tax on gross earnings from interest and dividends, also withheld at the source, treated that type of passive investment income as involving few or no expenses of production. The ruling said (1950–1 Cum.Bull. at 66) that the provisions of the foreign tax "assume the aspects of Sections 211 and 231 of the [1939] Internal Revenue Code with respect to the taxation of gross income of nonresident alien individuals and nonresident foreign corporations." As we discuss *infra,* the postulate of those provisions of the domestic Code is that such nonresident taxpayers have few or no offsetting costs or expenses in this country or connected with income-producing activity here.

The last foreign tax credit ruling in which the plaintiff (and the trial commissioner) rely is I.T. 4025, 1950–2 Cum. Bull. 50,[15] crediting Peruvian taxes, likewise collected by withholding, on "income" derived from credit operations, as well as "income" derived by residents abroad from Peruvian rural and urban property, non-commercial professional profits, and compensation for personal services. The ruling is very short, without any satisfactory explanation, but there is no intimation that the foreign tax, which was on "income" and "profits", is on gross income, without deductions. Moreover, in major respects the tax related to income obtained by nonresidents, and the same comment applies as we have just made about the other 1950 ruling involving nonresidents.[16]

*Domestic taxes*: There are some minor federal income taxes imposed on gross

---

14. I.T. 2620, *supra,* and I.T. 4025, *infra,* were declared obsolete in Rev.Rule 70–293, 1970–1 Cum.Bull. 282. A declaration of obsolescence means that a particular ruling is no longer determinative with respect to future transactions. It does not mean that the conclusion or underlying rationale has no current applicability. Rev.Proc. 67–6, 1967–1 Cum.Bull. 576.

15. See note 14, *supra.*

16. For other IRS rulings with some bearing on the problems, see Owens, The Foreign Tax Credit (1961) 37 ff. We believe that the result in none is inconsistent with our analysis.

income—plaintiff urges them strongly as analogies or exemplars—but here, too, we judge that Congress has used a gross income levy only in those instances in which it seemed clear that costs and expenses within this country (or affecting the production of the income in this country) would not wipe out net gain.

Sections 871 and 1441 of the Internal Revenue Code imposed a tax on certain non-business gross income of nonresident aliens from investments, compensation, etc. The assumption is, as we understand it, that such nonresident taxpayers, not engaging in business here, are very unlikely to have expenses which will reduce to zero their net gains from the taxed items. A like assumption underlies § 881(a)(1) imposing a 30 percent tax on the gross income from similar investment sources in this country by a foreign corporation "but only to the extent the amount so received is not effectively connected with the conduct of a trade or business within the United States." [17] For a foreign corporation connected with United States business, § 882 imposes the tax on taxable income, after deductions related to the United States activities (with the exception that charitable contributions need not be so related). The normal expectation is, of course, that taxpayers engaging in business can and may well suffer losses in some years.

Plaintiff points out that the portion of the social security tax imposed by § 3101 on wages received by resident employees, and paid by the employee, is an income tax on gross income. See Helvering v. Davis, 301 U.S. 619, 635, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); Cain v. United States, 211 F.2d 375, 377 (C.A.5, 1954) cert. denied, 347 U.S. 1013, 74 S.Ct. 868, 98 L.Ed. 1136.[18] Again, it seems clear that the legislative assumption was that it would be rare for an employee to spend so much of his own money in producing his wages that all net gain would be eliminated.[19]

■ This review of the pertinent judicial decisions and Internal Revenue Service rulings, as well as of comparable gross income levies in the federal income tax system, persuades us that the term "income tax" in § 901(b)(1) covers all foreign income taxes designed to fall on some net gain or profit, and includes a gross income tax if, but only if, that impost is almost sure, or very likely, to reach some net gain because costs or expenses will not be so high as to offset the net profit.[20] *Cf.* Owens, The Foreign Tax Credit (1961) 52–4.

We see nothing in the comment in the Senate report on the 1942 amendment adding the "in lieu" provision (now in § 903) to the foreign tax credit [21] basi-

17. The Revenue Service has ruled that the foreign tax credit is permissible for foreign taxes on comparable gross income of United States citizens derived from foreign sources. Rev.Rule 66–65, 1966–1 Cum.Bull. 175; I.T. 4013, 1950–1 Cum. Bull. 65.

18. The Service has held that taxes paid under a foreign counterpart of § 3101 are creditable. Rev.Rul. 69–338, 1969–1 Cum.Bull. 194. See also note 9, *supra.*

19. Defendant wrongly characterizes an employee's expenses as insubstantial; as plaintiff points out, millions of wage-earners pay union dues which are not insubstantial expenses. Nevertheless, it is almost unknown, or at best extremely rare, for an employee's deductible expenses to eat up all his wages or salary.

20. Defendant's presentation has oscillated between the points that no gross income tax is creditable and that such a levy can be credited if the taxpayer's costs and expenses are insubstantial, insignificant, or *de minimis.* As already indicated, we reject both formulations as too extreme, though we accept the Government's core notion that the foreign tax must be designed so as to reach some net gain.

21. S.Rep.No.1631, 77th Cong., 2d Sess., p. 131, 1942–2 Cum.Bull. 504, 602, said in pertinent part:

"In the interpretation of the term "income tax," the Commissioner, the Board, and the courts have consistently adhered to a concept of income tax rather closely related to our own, and if such foreign tax was not imposed upon a basis corresponding approximately to net in-

cally at odds with this interpretation, and something to support it. The report does flatly repudiate plaintiff's notion that all foreign gross income taxes were and are creditable. But the committee's reference to "gross income" taxes as barred by § 901, as then construed, must be taken together with the reference to foreign taxes "imposed upon a basis corresponding *approximately* to net income" (emphasis added). We believe the authors of the report did not mean to blanket within their exclusion of gross income tolls those gross income taxes expected to fall in the end upon net gain and thus to approximate a net income levy.[22]

## IV.

■ Do the three foreign taxes we are now discussing (Thailand Business Tax, Type 1 and Type 2; Philippines Tax on Banks; Buenos Aires Tax on Profit-Making Activities) meet this test? Their coverage is summarized at the outset of Part II, *supra*, and there is little difficulty in concluding that they do not.

Each of the taxes is levied on gross income from the banking business and allows no deductions for the costs or expenses of producing the income. Any taxpayer could be liable whether or not it operated at a profit during the year. The only question is whether it is very unlikely or highly improbable that taxpayers subject to the impost would make no profit or would suffer a loss. Plaintiff has presented no proof to this effect and does not very strongly urge that proposition. Obviously, it and the other

institutions subject to the taxes had substantial costs in their banking business, salaries and rent being the major items. The covered banks must also have had bad debts and defaults, and these would have to be taken into account in calculating annual net gain.

The three taxes were each imposed on banks generally, not merely on the successful ones. Banks do suffer losses in certain years, especially newly established banks, and some have even been known to fail. There is no reason to believe that banks in Thailand, the Philippines, and Argentina are any different. Nor can one say on this record that the three governments felt that net gain would always (or nearly so) be reached by these special banking levies, or that they designed these particular taxes to nip such net profit. Each of the three jurisdictions had a general net income tax (comparable to ours, and admittedly creditable) which the Bank of America and other banks had to pay. That was the impost intended to reach net gain.

We cannot say, therefore, that there was only a minimal risk that the combination of a bank's expenses plus its bad debt experience (and other losses) would outbalance its net gain or profits in any particular year—or that the foreign countries so considered. On the contrary, as with the insurance company in *Allstate*: "Plaintiff may have had a gain or it may have had a loss in operating its insurance [banking] business during the year in question, but this would not affect the premiums [banking] tax

---

come it was not recognized as a basis for such credit. Thus if a foreign country in imposing income taxation authorized, for reasons growing out of the administrative difficulties of determining net income or taxable basis within that country, a United States domestic corporation doing business in such country to pay a tax * * * measured, for example, by gross income, gross sales or a number of units produced within the country, such tax has not heretofore been recognized as a basis for a credit. Your committee has deemed it desirable to ex-

tend the scope of * * * [§ 901 by adding § 903]."

**22.** Coming after the original enactment of the predecessor of § 901(b) (1), and purporting merely to describe the then practice under an interpretation of that provision, the 1942 report does not, in any event, have the same standing as legislative history antedating passage of the statute being interpreted. *Cf.* Rainwater v. United States, 356 U.S. 590, 593, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958); Fogarty v. United States, 340 U.S. 8, 13–14, 71 S.Ct. 5, 95 L.Ed. 10 (1950).

it had to pay." 419 F.2d at 414, 190 Ct. Cl. at 28.

The result is that the plaintiff is not entitled to recover (except for the inadvertent disallowance by the Service of a small credit for 1959, see finding 18) and its petitions must be dismissed (except for that slight error).

59 CCPA